**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**DURHAM DIVISION**
**1:99CV00764**

JEFFREY CLAYTON KANDIES )
)
) PETITIONER'S BRIEF ON REMAND
) FROM SUPREME COURT OF THE
v. ) UNITED STATES
)
GERALD BRANKER )
)

Jeffrey Kandies' *Batson* claim is at least as strong as the claim found meritorious in *Miller-El v. Dretke*, 545 U.S. 231 (2005) (*Miller-El II*), the decision that prompted the Supreme Court to vacate the judgment in this case. Mr. Kandies is entitled to a writ of habeas corpus.

At Kandies' capital trial, District Attorney Garland Yates peremptorily struck black venire members four times more frequently than he struck white venire members. He struck every one of the first five eligible black venire members, and each time the defense objected under *Batson v. Kentucky*, 476 U.S. 79 (1986). Ultimately, the prosecution struck nine of twelve black venire members, and offered a host of reasons, including: the juror was hesitant about the death penalty, had not thought about the death penalty, had failed to disclose prior criminal convictions, had worked with children the same age as the victim, or was thought by local law enforcement to be weak on the death penalty.

Yates' reasons for his peremptory strikes against these black venire members do not withstand scrutiny. Time and again, Yates accepted whites who shared the same characteristic that purportedly led him to strike a black venire member. Repeatedly, he failed to question the black venire member about the factor later upon which he relied for his strike. In the end, Yates struck black jurors for reasons unsupported by the record, reasons that were implausible, and reasons that would have made them favor the prosecution's position.

Yates also modified his questions about the death penalty depending on a potential juror's race. For a clear majority of white venire members, the critical question regarding the death penalty was vague: can you follow the law? For a clear majority of black venire members, this critical question was far more pointed: do you realize you may have a duty to impose the death penalty?

Finally, Yates has a widely-recognized history of using peremptory strikes in a discriminatory way. Leading members of the Randolph County bar, including a former assistant under Yates, describe his consistent, long-standing pattern of disproportionate exclusion of black venire members. On two separate occasions, trial judges have found he impermissibly used race in exercising peremptory strikes.

The Supreme Court believed *Miller-El II* suggested the previous disposition of this issue should

be revisited. Given the compelling evidence of improprieties here, that mirror those in *Miller-El II*, this Court should grant habeas relief.

## Procedural History

Mr. Kandies is currently under sentence of death. After granting a certificate of appealability on his *Batson* claim, the Fourth Circuit denied relief despite two judges expressing serious misgivings about it. *Kandies v. Polk*, 385 F.3d 457 (4th Cir. 2004). The Supreme Court granted *certiorari*, vacated the judgment, and remanded for further consideration in light of *Miller-El II*.[1] *Kandies v. Polk*, 125 S. Ct. 2974 (2005). The Fourth Circuit, in turn, remanded to this Court.

## Argument

*Miller-El II* granted relief under *Batson* based on four indicia of racially discriminatory peremptory challenges: (1) the statistical disparity between the percentage of potential white and black jurors struck; (2) the prosecutor striking black potential jurors for reasons applicable to white jurors not struck; (3) other types of racially disparate treatment, such as jury shuffling and disparate questioning; and (4) the history of racially discriminatory jury selection in the jurisdiction. *Miller El II*, 545 U.S. at 240-64. As shown below, each of these four indicia is present in this case.

### I.  Application of 28 U.S.C. § 2254

Kandies' case, like *Miller-El*, is controlled by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). Accordingly, Kandies must show the state adjudication is contrary to or an unreasonable application of federal law or involves an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

North Carolina's history of adjudicating *Batson* claims offers no reason for confidence in its determination of this claim. Since *Batson* was decided in 1986, the North Carolina Supreme Court has adjudicated *Batson* claims in roughly 100 cases. It has never granted a new trial based on *Batson*. Its adjudication of Kandies' *Batson* claim was contrary to *Batson* and its progeny. Specifically, it rebuffed

---

[1] The Supreme Court remanded only three other cases in light of *Miller-El II*. *E.g.*, *Barnette v. United States*, 546 U.S. 803 (2005), *Snyder v. Louisiana*, 545 U.S. 1137 (2005), *Hightower v. Terry*, 545 U.S. 1124 (2005).

Kandies' arguments that the prosecutor accepted white venire members who exhibited the same characteristics as black venire members whom the prosecutor struck:

> Defendant's approach involves finding a single factor among the several articulated by the prosecutor and matching it to a passed juror who exhibited the same factor. We have rejected this approach and do so again because it fails to address the factors as a totality which when considered together provide an image of a juror considered undesirable by the State.

*State v. Kandies*, 467 S.E.2d 67, 75-76 (N.C. 1996) (internal quotation marks and alterations omitted).

This ruling is contrary to or an unreasonable application of Supreme Court precedent.

> None of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one. . . . A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.

*Miller-El II*, 545 U.S. at 247.

Moreover, the state court adjudicated Kandies' *Batson* claim without factoring the strength of his *prima facie* case into its evaluation of the pretextual nature of the prosecutor's reasons for his strikes. The trial court did not determine if a *prima facie* case had been presented. Instead, the prosecutor simply volunteered explanations for these strikes. The trial court's failure to engage in the analysis of whether a *prima facie* case existed meant it could not weigh its strength in deciding if the prosecutor's race-neutral explanation was pretextual. Thus, "[t]he state court's conclusion that the prosecutors' strikes . . . were not racially determined is shown up as wrong to a clear and convincing degree; the state court's conclusion was unreasonable as well as erroneous." *Miller-El II*, 545 U.S. at 266.

## II. Statistical Disparity in State's Use of Peremptory Strikes

In Kandies' trial, Yates peremptorily struck nine of the twelve eligible black venire members.[2] He struck only six of the thirty-four eligible white venire members. (Ex. 1, Affidavit of Catherine Grosso and Barbara O'Brien at ¶10, Table 1) Thus, he used peremptory strikes to exclude 75% of the eligible black venire members, more than four times the rate (18%) at which he struck all other venire members,

---

[2] Angelia Randleman, Altrea Jinwright, Lillie Massey, Lillian Rawlinson, Arthur McClure, Fred Campbell, Garry Hines, Henry Wilson, and Normesa Oliver. *See* Ex. 14 (*State v. Kandies*, Chart of Venire Members).

3

including whites and other non-black racial minorities. (Ex. 1, Grosso and O'Brien Affidavit, Table 1) In *Miller-El II*, the prosecution struck ten of the eleven eligible black venire members, a 91% strike rate, in contrast to a 13% strike rate for white venire members. Here, as in *Miller-El*, the statistical evidence is "remarkable," and "[h]appenstance is unlikely to produce this disparity." *Id.* at 241 (internal quotation marks omitted). Indeed, a statistical analysis of Yates' jury selection in every case involving a Randolph County defendant who remains on death row reveals his rate of striking black venire members is 2.8 times that of striking white venire members. (Ex. 1, Grosso and O'Brien Affidavit at ¶9) When reviewing Yates' strike patterns in the 1990s, when Kandies was tried, his rate of striking black venire members is 3.0 times that of striking white venire members. *Id.*

### III. Disparate Treatment of Similarly Situated Venire Members

Yates repeatedly accepted white venire members who shared similar characteristics that purportedly led him to strike black venire members. This disparity demonstrates his reasons for striking black venire members were pretextual. *See Miller-El II*, 545 U.S. at 241 (noting that "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve" are "[m]ore powerful than these bare statistics").

#### 1. Hesitation About Imposing the Death Penalty

Yates stated he peremptorily struck the first eligible black venire member, Angelia Randleman, in part because she was "hesitant on the death penalty question." (JS Tr. at 124)[3] When the second eligible black venire member, Altrea Jinwright, was called, he struck her too, stating that she was "hesitant on the death penalty question." (JS Tr. at 124) A comparison of Randleman's and Jinwright's responses with those of white venire members the prosecution accepted demonstrates racially disparate treatment.

Randleman's responses regarding the death penalty in fact indicate *no* hesitation about the death penalty:

---

[3] The jury selection transcript was lodged by the respondent contemporaneously with its response to the petition for writ of habeas corpus. *See* Docket No. 8 (documents filed in support on October 22, 1999). Citations to the jury selection transcript in this brief are in the format "JS Tr. at __." The jury seating chart prepared by the trial court deputy clerk is attached as Ex. 2.

4

| | |
|---|---|
| Mr. Yates: | I need to know your feelings concerning -- whether or not you have any beliefs or feelings in opposition to the death penalty. |
| Juror Ms. Randleman: | No. |
| Mr. Yates: | Do you have any feelings or beliefs as far as life imprisonment? |
| Juror Ms. Randleman: | No. |
| Mr. Yates: | So, you will be willing to consider both possible punishments in the case? |
| Juror Ms. Randleman: | Yes. |
| Mr. Yates: | You ever thought about it at any time in the past? |
| Juror Ms. Randleman: | I have thought about it, seen different shows on it, I guess you would say, but not really to have an opinion. |
| Mr. Yates: | Okay. And you realize that at this point you might be selected to be a juror in a case in which the death penalty would be a possibility? |
| Juror Ms. Randleman: | Yes. |
| Mr. Yates: | And so you do think that you can follow the law as the Judge charges you concerning the death penalty? |
| Juror Ms. Randleman: | By the evidence, yes. |
| Mr. Yates: | Yes. |
| Juror Ms. Randleman: | Okay. |
| Mr. Yates: | And knowing that, if the -- first of all, if the State presents aggravating circumstances which outweigh the mitigating circumstances and it's sufficiently substantial to call for the death penalty beyond a reasonable doubt then it would be your duty to return the death penalty? |
| Juror Ms. Randleman: | Yes. |
| Mr. Yates: | And if you found the other way then it would be your duty to return life imprisonment? |
| Juror Ms. Randleman: | Yes. |
| Mr. Yates: | You believe you can follow both of those? |
| Juror Ms. Randleman: | I can. |

(JS Tr. at 85-87)  Jinwright's responses were almost as favorable to the prosecution:

| | |
|---|---|
| Mr. Yates: | Do you have any strong feelings for or against the death penalty? |
| Juror Ms. Jinwright: | Not really, No. |
| Mr. Yates: | Okay. By your hesitancy, have you thought about it or have you ever given it any consideration? |
| Juror Ms. Jinwright: | Yes, I have. I feel in some cases, you know, when it's a really heinous crime that maybe the death penalty is necessary. But I just wouldn't, you know, just automatically say the death penalty. |
| Mr. Yates: | Okay. And so you believe in some cases it's applicable and some cases you don't think so? |
| Juror Ms. Jinwright: | Right. |
| Mr. Yates: | [If aggravating circumstances outweigh mitigation and are sufficiently substantial,] do you believe you could vote for the death penalty? |
| Juror Ms. Jinwright: | Yes. |
| Mr. Yates: | You understand that if you so find it would be your duty to recommend the death penalty? |

Juror Ms. Jinwright:     Yes.

(JS Tr. at 116-17)

Conversely, Yates accepted one white venire member after another who hesitated about the death penalty as much as or more than Randleman and Jinwright:

- Rhonda Kinnecom: "There are times when it's necessary. . . . I wouldn't automatically say one way or the other."

- Read Spence: "That's a hard question, I have been thinking about that since we came in here Tuesday, a lot. Only in certain cases do I think it would be necessary."

- Christopher Foxworth: "I have never made a decision about it."

- Duncan Hutchinson: "It's just that it's extremely serious. It's ultimately a tremendous decision to have to make, for anyone." Asked if he could consider a death sentence, Hutchinson replied, "I think so." Asked if he could consider a life sentence, he answered, "Sure."

(JS Tr. 156, 666, 780, 669-70) Many others expressed similar views.[4] That Yates struck black venire members on their death penalty views at least as favorable to the state as numerous white jurors he accepted amply demonstrates pretext.

2.     Failure to Have Thought About the Death Penalty

Yates' standard questioning of prospective venire members about their views on the death penalty began by asking them if they had any strong views about the death penalty. (JS Tr. at 47-48) Many prospective jurors responded to this question by stating their views on the death penalty, but at least fourteen jurors -- ten whites and four blacks – simply said no, they did not have strong views. Yates followed up on this issue with all four black jurors. In contrast, with a third of the white venire members, he asked no further questions. When three black venire members stated they had not thought about the death penalty, Yates

---

[4] For example, Maxine Shina stated, "I believe in the death penalty in certain situations," but the state sought no elaboration. (JS Tr. at 89) George Morgan revealed, "I believe in the death penalty. But if I was down the hall in another courtroom with a civil case I would feel better about it." (JS Tr. at 112) Cynthia Glass stated, "I think it's appropriate in some cases." (JS Tr. at 148) Tony Furniss-Roe indicated, "My feeling is if it warrants it, then if not --," but the state asked no follow-up questions. (JS Tr. at 170) Jo Ann Summey stated, "I'm not an absolute proponent of the death penalty, but I think it's warranted in some cases." (JS Tr. at 459) Michael Shields said, "In some instances I'm for the death penalty." (JS Tr. at 567) Sherry Cross stated, "If the evidence supports that, yes, I can consider the death penalty. But it has to support it in order for me to do that." (JS Tr. at 611) Rick Puckett responded, "I don't have strong feelings either way." (JS Tr. at 940) The state passed these white venire members.

asserted this basis for striking each one.  (JS Tr. at 160 ("Ms. Rawlinson had not even thought about the death penalty . . . . And Mr. McClure was in a similar situation . . . ."));[5] (JS Tr. at 599 ("[Hines'] answer … concerning the death penalty, he has never thought about the death penalty.")).

"On the face of it, the explanation is reasonable from the State's point of view, but its plausibility is severely undercut by the prosecution's failure to object to other panel members who expressed [similar] views . . . ."  *Miller-El*, 545 U.S. at 248.  Specifically, white venire member Sherry Cross was asked if she had any strong feelings on the death penalty, and she replied, "No."  She then was asked if she had considered it at some time in the past, and she replied, "No."  Nevertheless, Yates accepted Cross as a juror.  (JS Tr. at 609, 612)  Yates' acceptance of Cross is not explained by her other responses in voir dire.  As noted above, her views on the death penalty reflected as much or more hesitation than those of the black venire members purportedly removed on that basis.  *See* JS Tr. at 160 (black venire member Rawlinson and McClure), 599 (black venire member Hines).  Yates' acceptance of Cross suggests race motivated his decisions to strike Rawlinson, McClure, and Hines.

### 3.   Failure to Disclose Criminal Record

Yates defended his peremptory strikes of black prospective jurors Randleman, Campbell, Hines, and Wilson in part on the basis of their alleged failure to disclose prior criminal records.  Yet he passed at least eight white venire members with prior convictions undisclosed on their questionnaires or during questioning.  (Ex. 4, Tab A, Criminal Records for Kinnecom, Mayberry, Glass, Spivey, Furniss-Roe, Summey, Cross, Seiver)  The fact that the passed white venire members' undisclosed convictions are relatively minor – *e.g.*, speeding, worthless checks, illegal fishing – does not distinguish them from the black venire members supposedly struck on this basis.  For example, Randleman's only asserted convictions were for speeding and worthless checks.

---

[5] McClure clearly stated he had thought about the death penalty.  When Yates asked him if he had ever thought about the death penalty, McClure answered, "Yes."  Yates made no further inquiries.  (JS Tr. at 153)

Either the prosecution was not aware of these convictions because it ran criminal records checks only of the black venire members, or it was aware of them but chose to pass the jurors. In either situation, it shows Yates' asserted reliance on this factor in striking black venire members was pretextual.

### 4. Experience Working with Young Children

Yates asserted he struck black venire member Jinwright because "she has worked with three- and four-year-old children."[6] (JS Tr. at 124) During voir dire, Jinwright explained she worked for American Express and then as a housing counselor. Prior to that employment, she had worked for Presbyterian Day Care for four months. (Jinwright Jury Questionnaire)[7] The state's questioning proceeded as follows:

| | |
|---|---|
| Mr. Yates: | What ages of children were you -- did you take care of at the Day Care? |
| Juror Ms. Jinwright: | Toddlers, and then in the afternoon the school age children came. |
| Mr. Yates: | By toddlers, is that -- |
| Juror Ms. Jinwright: | They were, you know, up to when they go to school, three or four, something like that. |
| Mr. Yates: | Three- or four-year-olds. Okay. And in this case it's alleged that the victim was four years old at the time of the death. Would it give you any problem sitting on a jury in which the victim being a four-year-old and you have dealt with small children? |
| Juror Ms. Jinwright: | No. |

(JS Tr. at 114-15)

Yates accepted venire members whose current and past employment was similar to that of Jinwright. White prospective juror Read Spence was working as a teaching assistant at Greensboro Day School, a school for children pre-Kindergarten through 12th grade. From 1988 to 1990, she was a kindergarten teacher at First Presbyterian Church and worked with four- and five-year-old children. (Spence Jury Questionnaire) Even though Spence worked with nearly identically-aged children as Jinwright, as well as for a substantially longer period of time and more recently, Yates accepted her and asked no questions about that employment. Furthermore, Yates merely confirmed her current

---

[6] As noted below, Jinwright's employment history working with children the same age as the victim should have made Jinwright *more* attractive to the prosecution, not less. *See infra* Section 5.e. *See also Miller-El* II, 545 U.S. at 247 (noting struck black venire member should have been an "ideal juror in the eyes of a prosecutor seeking a death sentence").

[7] The jury questionnaires for all venire members questioned were attached as an exhibit to the deposition of Garland Yates, Docket No. 97.

employment as a teaching assistant, not even asking the ages of the children. Yates conducted the same rudimentary questioning with white venire member Peggy Arrington, who sat as Alternate Juror No. 3. On her juror questionnaire, Arrington indicated she had been working as the librarian at an elementary school for 21 years. (Arrington Jury Questionnaire) Yates only confirmed her employment and did not ask, as he did with Jinwright, whether sitting on a jury where the victim was a young child would affect her since she worked with young children. (JS Tr. at 1004-05) However, when Yates asked, "And can you think of any reason you could not be a fair and impartial juror in this case," Arrington replied, "Well, I'm thinking of my little children at school. It would be hard for me to [be impartial] – It would be hard for me because I have really young ones at school." [8] (JS Tr. at 1006) Yet Yates passed her. This disparate treatment, particularly of Arrington, certainly undermines his asserted basis for striking Jinwright.

### 5. Unsupported or Irrational Grounds for Strike

Yates' racially disparate treatment manifested itself in other ways. Not only did he justify striking black venire members on grounds that applied equally to white members he passed, but he also repeatedly struck black jurors for reasons unsupported by the record and for facially implausible reasons. A careful examination of these instances reinforces the conclusion that the prosecution's asserted non-racial grounds were pretextual. *See Miller-El II*, 545 U.S. at 253-63.

### a. Discussions with High Point Police Department

Yates stated among his reasons for striking two of the eligible black prospective jurors, Rawlinson and McClure, the fact that he had "discussed the panel with the High Point Police Department, and they indicated [prospective jurors McClure and Rawlinson] would not be good jurors for this type of case because 'they were weak on the death penalty question.'" (JS Tr. at 160-61) *See also State v.*

---

[8] In addition to accepting these venire members, Yates accepted six white venire members who had children near the victim's age. *See* Jury Questionnaires of Puckett (five-year-old and two-year-old), P. Martin (two-year-old), Shields (two-year-old and five-year-old), Shina (two-and-a-half-year-old), Spivey (20-month-old), and Kinnecom (three-year-old).

*Kandies*, 467 S.E.2d at 76;[9] *Kandies v. Polk*, 385 F.3d 457, 475-76 (4th Cir. 2004) (Gregory, J., writing

separately and announcing the judgment).  As Yates explained:

> Mr. Yates:    Your Honor, I would just point out that Ms. Rawlinson had not even
> thought about the death penalty, certainly was not a strong opinion for or
> against the death penalty. And Mr. McClure was in a similar situation
> except that he also -- my officer noticed that he nodded off at least twice.
> Not that I'm saying this was the most interesting part of the trial, but I
> certainly do not believe he was paying sufficient attention in this case,
> though. *Also, I discussed the jury panel with the High Point Police
> Department, and they indicated Mr. McClure and Ms. Rawlinson would
> not be good jurors for this type of case.*
>
> The Court:    Do you want to elaborate on that, please?
>
> Mr. Yates:    Your Honor, I asked most everybody and basically indicated anyone that
> they had any contact with prior to the trial.  Primarily, the reason was
> that they were weak on the death penalty question.

(JS Tr. at 160-61)

Judge Gregory viewed this asserted reason for the peremptory challenges to Rawlinson and

McClure with considerable skepticism:

> I observe that in most instances police will not have a basis upon which to render . . .
> advice [on a prospective juror's stance on the death penalty]. Of course, there may be
> some rare instances where police can advise prosecutors about a prospective juror['] s
> stance on the death penalty due to some prior contact where the prospective juror and
> police discussed at length the death penalty or an officer heard the prospective juror
> discussing his or her views on the death penalty. Here, when given the opportunity, the
> State failed to set forth the basis upon which the High Point Police Department concluded
> that Ms. Rawlinson and Mr. McClure "would not be good jurors for this type of case"
> because "they were weak on the death penalty question." Moreover, the State's assertion
> that the High Point Police Department indicated that Ms. Rawlinson and Mr. McClure
> were weak on the death penalty contradicts its observation, after questioning and
> observing Ms. Rawlinson and Mr. McClure, that they "were not a [sic] strong opinion for
> or against the death penalty."
>
> Accordingly, the State's assertion that it struck Ms. Rawlinson and Mr. McClure because
> the High Point Police Department "indicated [they] would not be good jurors in this type
> of case" raises suspicion.

*Kandies v. Polk*, 385 F.3d at 475-76 (Gregory, J., writing separately); *see also id.* at 500 (Traxler, J.,

---

[9] On direct appeal, the state supreme court expressly found: "As his reason for these dismissals, the prosecutor stated
that a source within the High Point Police Department indicated that Rawlinson and McClure would not be good
jurors for this case because they were weak on the death penalty."  *Kandies*, 467 S.E.2d at 76.  This finding of
historical fact is entitled to a presumption of correctness in habeas proceedings.  28 U.S.C. §2254(d).

concurring) (noting "concern . . . about this type of reason as it is virtually impossible for the defense to effectively challenge").[10]

This purportedly race-neutral reason given for striking Rawlinson and McClure has no basis in fact. In his deposition, Yates testified he never spoke to any members of the High Point Police Department concerning any prospective jurors in Kandies' case. He stated he had asked newly-hired Assistant District Attorney Andrew Gregson to pass around the jury list to see if any police officers knew any of the prospective jurors and whether any of the prospective jurors had a criminal record. (Deposition of Garland Yates at 13, 15, 16, 24-27)[11] Yates did not seek information regarding prospective jurors' views on the death penalty. (Deposition of Garland Yates at 26-27)

While Kandies' case was a Randolph County case, the jury was selected from Guilford County, a county with a substantial black population in the 1990s.[12] According to the 1990 United States Census, High Point had a population of approximately 69,000 people at the time of Kandies' trial, with blacks accounting for a little over a third of the city's population.[13] It is unlikely that law enforcement officers in a particular community in Guilford County would be familiar with the death penalty views of two consecutive, unrelated black venire members.

    b.  Failure to Think about Death Penalty

Yates purportedly struck black venire member McClure in part because "he had not even thought about the death penalty." (JS Tr. at 160) Yet when he asked McClure if he had ever thought about the death penalty, McClure answered, "Yes." Yates inquired no further. (JS Tr. at 153) The record provides

---

[10] In addition, Lillian Rawlinson, interviewed in 2008 regarding her experiences as a prospective juror, stated under oath: "At the time I was called for jury duty there was no one in the High Point Police Department or any other law enforcement agency that would have knowledge of my views regarding the death penalty." (Ex. 3, Lillian Rawlinson Affidavit at ¶6)

[11] The depositions of Garland Yates and Andrew Gregson have been previously lodged with this Court. *See* Docket No. 97 (September 15, 2008).

[12] In 1990, Guilford County had a population of approximately 347,000, with blacks accounting for more than 25% of the population. *See* http://data.osbm.state.nc.us/pls/census/dyn_census_profiles_l.show.

[13] *Id.*

no support for Yates' claim that he exercised a peremptory strike on this basis.

c.      Hesitancy about the Death Penalty

Yates purportedly struck black venire member Randleman because she was "hesitant on the death penalty questions." (JS Tr. at 124)  To the contrary, her responses revealed no such hesitation.  (JS Tr. 85-87, *see supra* at Section III.1)

d.      Undisclosed Criminal Records

The prosecution struck four black venire members, Campbell, Wilson, Randleman and Hines, based in part on alleged criminal records.[14]  Criminal records searches cast considerable doubt on the existence of these purported convictions.[15]  In providing reasons for his use of a peremptory strike against prospective juror Campbell, the prosecutor asserted that "a person named Fred Campbell has a prior common law robbery conviction." (JS Tr. at 577)  North Carolina's criminal records database contains no evidence of such a conviction.  (Ex. 4, Affidavit of Barrie Wallace at ¶7)  In a sworn affidavit, Campbell denies ever having been convicted of robbery or any other felony.  (Ex. 5, Affidavit of Fred Campbell)

As to black venire member Henry Wilson, the prosecutor asserted he found records matching Wilson's birth date for reckless driving, driving while impaired, four worthless checks, two injury to personal property charges, a simple assault, and assault by pointing a gun.  (JS Tr. at 745)  A search of North Carolina's criminal records database reveals only traffic convictions, with no record of any form of assault arrest or conviction.  (Ex. 4, Tab A, Criminal Records for Kinnecom, Mayberry, Glass, Spivey, Furniss-Rose, Summey, Cross, Seiver)  The significant disparity between the records the state relied upon but refused to disclose[16] and the records available on North Carolina's criminal record database indicates Yates relied on manufactured or irrational grounds for striking blacks.

---

[14] Any records or notes of the criminal checks done by the state were not provided in response to discovery requests. *See* Deposition of Garland Yates at 22 (noting he did not locate these criminal record checks).  *See also* Section 3, above, regarding disparate treatment of black venire members with respect to undisclosed criminal records.

[15] The process Kandies used to research criminal records is explained at Ex. 4, Affidavit of Barrie Wallace at ¶¶3-5.

[16] During jury selection, Kandies asked the trial court for the criminal records information that the state was relying upon in using peremptory strikes.  The trial court denied his renewed motion to direct the state to divulge this criminal records information.  (JS Tr. at 188-89; Ex. 6, Pre-Trial Motions Tr. at 20-21)

12

Even assuming the accuracy of the prosecution's asserted, but no longer available, criminal records, striking jurors on this basis is implausible. The questionnaire asked, "Have you ever been convicted of a criminal offense?"[17] By the prosecutor's account, Randleman had two speeding tickets and a bounced check. The failure to volunteer these as "convict[ions] of a criminal offense" scarcely suggests dishonesty.[18] Not one member of the jury pool, regardless of race, answered this question affirmatively.[19] As noted above, Yates passed at least eight white venire members who had one or more prior criminal convictions they did not disclose on their jury questionnaires. On balance, the prosecution's decision to strike black jurors on so flimsy a basis demonstrates pretext.

Striking these prospective jurors based on alleged undisclosed criminal convictions suggests pretext for still another reason. *Miller-El II* emphasized that when the prosecution explains its decision to strike a minority juror by relying on a factor about which it did not meaningfully question the juror, it is evidence of pretext. 545 U.S. at 246 ("'The State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.'" (citations omitted)). Here, at the time each juror was questioned, Yates possessed two pieces of conflicting information: the juror's questionnaire denying ever having been convicted of a criminal offense, and criminal record checks indicating convictions of a person with his or her name. Yates relied upon this supposed deception as a basis for his strikes, yet he did nothing to explore the matter with these prospective jurors. For example, Yates explained his strike of Randleman as follows: "Ms. Randleman's form indicates that she had not been convicted of any criminal offense. Her record indicates that she has been convicted of worthless checks and two speeding violations." (JS Tr. at 124) Yet Yates betrayed not the slightest interest regarding her criminal record

---

[17] It further asked, "If so, what?" The blank after this question was less than an inch and a half long.

[18] Even as to Hines, who purportedly had convictions for driving while impaired and driving while license revoked, the natural assumption would be that he regarded these traffic-related offenses as not criminal convictions, and few would conclude *without further inquiry* that he committed perjury.

[19] Prospective juror Antonowicz placed a question mark in the blank and indicated he had a ticket for speeding 100 miles per hour when he was young. (Antonowicz Jury Questionnaire)

13

during voir dire, electing not to ask her additional questions regarding her criminal record despite her

cooperative responses to similarly probing questions:

> Mr. Yates: And have you ever been a party, witness, or defendant in any kind of criminal case?
> Juror Randleman: Yes.
> Mr. Yates: Have you ever been a witness in a case?
> Juror Randleman: Wait. Party, witness, or defendant?
> Mr. Yates: I think I said party, witness, or defendant. I'm just – I'm reading along with your survey as I go along. You have been a witness for the State before?
> Juror Randleman: Yes, sir.
> Mr. Yates: Would that experience give you any problem sitting on this case?
> Juror Randleman: No, just when they called me it was dismissed.
> Mr. Yates: And I believe you have also been a witness for the defendant. Is that the same case?
> Juror Randleman: Yes.
> Mr. Yates: I see the case was dismissed. Have you ever served on a jury before?
> Juror Randleman: No.
> Mr. Yates: And I believe you are divorced, is that correct?

(JS Tr. at 83-84) As to the other three black venire members whose removal was justified on this basis –

Campbell, Hines,[20] and Wilson -- Yates never questioned them about their supposed failure to disclose

their criminal history. To the contrary, during a litany of routine questions, Yates merely asked whether

they had been convicted of a criminal offense and accepted their negative responses without further

inquiry. (JS Tr. at 575, 591, 748)[21] For Campbell, merely asking him additional questions regarding his

supposed criminal record would have eliminated this basis for removing him. Campbell's sworn affidavit

states, "If the prosecutor had asked me about it, I would have explained that he had me confused with

another Fred Campbell." (Ex. 5, Affidavit of Fred Campbell) Here, as in *Miller-El II*, "the prosecution

asked nothing further about the [criminal convictions], as it probably would have done if the [failure to

---

[20] Yates also proffered Hines' concerns about his employment as a basis for striking Hines. (JS Tr. 599) Nevertheless, Yates accepted two white venire members, Mayberry and Bryant, despite their concern about employment. Mayberry explicitly stated he was worried about missing work as it would "be a very big problem" and "would be a hardship" and it was "very possible" that he would be worrying about his job. (JS Tr. 132-33) Bryant also suggested that missing work, with nobody to cover his job, would be difficult. (JS Tr. 447)

[21] The prosecutor's questioning of Campbell is representative:
> Mr. Yates: And have you ever been a juror before this week?
> Juror Mr. Campbell: No, sir.
> Mr. Yates: And you ever been a party, witness, or defendant in court?
> Juror Mr. Campbell: No.
> Mr. Yates: And have you ever heard or read anything about this particular case? (JS Tr. at 569)

disclose them] had actually mattered.  There is no good reason to doubt that the State's afterthought . . . was anything but makeweight."  545 U.S. at 246.

                       e.   Pro-prosecution Experiences

Finally, Yates removed black venire members for reasons that would likely have rendered them favorable to the prosecution.  In a case where the victim was a four year-old girl who allegedly had been raped, beaten, and killed, he purported to remove black venire member Jinwright in part because "she has worked with three- and four-year-old children."  (JS Tr. at 124)  He moved to strike black venire member Helms for cause after she stated she would have difficulty being impartial because her own daughter had been raped.  (JS Tr. at 41-44)  In each instance, Yates' eagerness to dismiss black venire members was strong enough to overwhelm the juror's clear prosecution-friendly experience.  *Cf. Miller-El II*, 545 U.S. at 261 (noting how, when it came to black venire members, prosecutor "would suppress his normal preference for tough jurors and claim cause to strike").

    **IV.**      **Disparate Questioning of Venire Members Based on Race**

Yates questioned almost all eligible venire members about their views on the death penalty and ability to follow the law.  He began by asking the vast majority of venire members, regardless of race, whether they had any strong feelings about the death penalty.  (JS Tr. at 47-48)  The form that questioning took from that point varied significantly, however, depending upon the race of the potential juror.  As in *Miller-El*, Yates framed his questions to white jurors to retain them as jurors, but framed his questions to black venire members so as to generate grounds for a cause or peremptory strike.  *See Miller-El v. Cockrell*, 537 U.S. 322, 344 (2003) ("[I]f the use of disparate questioning is determined by race at the outset, it is likely a justification for a strike based on the resulting divergent views would be pretextual."); *Miller-El II*, 545 U.S. at 260 ("[I]f we posit instead that the prosecutors' first object was to use the [duty to impose death] script to make a case for excluding black panel members opposed to or ambivalent about the death penalty, there is a much tighter fit of fact and explanation.").

Yates used two predominant methods of questioning venire members regarding their ability to carry out their responsibilities as jurors during the sentencing phase.  As a general matter, when

questioning white venire members, the prosecutor simply summarized the four dispositive questions jurors would consider at the sentencing phase. At the end of this summary, the prosecutor then asked jurors whether they could follow that procedure.[22] His questioning of most black venire members was quite different. Rather than simply summarizing the relevant law and asking at the end whether the prospective juror could follow the law, Yates pointedly asked black venire members whether they realized that, in particular circumstances, the law imposed upon them a duty to return a death sentence. [23] Twenty-eight of thirty-three white panelists -- 88% -- were questioned with the "follow the law" script compared to only 45% of the black venire members.[24] Fifty-five percent of black venire members were

---

[22] The questioning of white venire member Styers was representative of this "follow the law" script:

Mr. Yates:    Okay. And you realize in this second – or rather, you will learn in the second phase the State will put on evidence of what is called aggravating factors which aggravate or make the crime particularly worse. The jury would first listen and determine whether or not beyond a reasonable doubt if there are aggravating factors in the case. If the jury finds that there are aggravating factors then the jury would then determine whether or not there were any mitigating factors which would be presented by the Defendant. The jury, if it finds mitigating and aggravating factors, would then weigh the aggravating factors against the mitigating factors which would be the second question. If the jury finds that the aggravating factors outweigh the mitigating factors the jury would go to the final question of whether the aggravating factors, when weighed against the mitigating factors, are sufficient beyond a reasonable doubt to call for the imposition of the death penalty. If the jury finds the answer to that question is also yes, it would be their duty to return the death penalty. If the jury finds that the State has not carried its burden beyond a reasonable doubt then it would be their duty to return life imprisonment. Could you follow that just very sketchy brief summary of what the process would be and make that determination? (JS Tr. at 49)

[23] The questioning of black venire member Jinwright is representative of the "duty to impose death" script:

Mr. Yates:    Okay. And so you believe in some cases it's applicable and some cases you don't think so?
Juror Ms. Jinwright:    Right.
Mr. Yates:    You realize in this case if it gets to the second phase that the State will submit aggravating factors that will tend to make the crime worse, and the Defendant will submit mitigating factors. You feel you could weigh those against each other and make a decision based on whether the aggravating factors outweigh the mitigation factors and if they are sufficiently substantial to call for the death penalty, do you believe you could vote for the death penalty?
Juror Ms. Jinwright:    Yes.
Mr. Yates:    You understand that if you so find it would be your duty to recommend the death penalty?
Juror Ms. Jinwright:    Yes.
Mr. Yates:    And if you found the other way you could vote for life imprisonment?
Juror Ms Jinwright:    Yes. (JS Tr. at 116-17)

[24] The following white venire members were questioned using some formulation of the "follow the law" script: Styers (JS Tr. 48-49), Shina (JS Tr. 89-90), Peterson (JS Tr. 70-71), Furniss-Roe (JS Tr. 170-71), Loftis (JS Tr. 436-37), P. Martin (JS Tr. 445-46), Owens (JS Tr. 564), Cross (JS Tr. 610-11), Abernathy (JS Tr. 58-59), Williams (JS Tr. 76-77), Diaz-Llaneza (JS Tr. 79-80), Spivey (JS Tr. 104-05), McNatt (109), Morgan (JS Tr. 113-14), Mayberry

16

questioned with the "duty to impose" questions, compared to only 12% of the white venire members.[25] The more pointed question was directed to the clear majority of black venire members, while more than three-quarters of non-black venire members were asked the blander question.

The racially disparate questioning used by Yates closely resembles the pattern in *Miller-El II*, upon which the Supreme Court relied in granting *Batson* relief. In *Miller-El II*, the prosecutor used two different scripts in describing the death penalty to potential jurors, one graphic and one bland. The graphic script was read to 53% of blacks and 6% of whites, the bland script to 94% of whites. 545 U.S. at 256. The precise methodology was similar, i.e. a graphic description of execution and an assertion that the law could compel a juror to vote for death, and the tactic was identical, i.e. singling out members of one racial group for a line of questioning calculated to maximize their chances of expressing unease about serving on a capital jury.

## V. History of Racially Discriminatory Jury Selection in Randolph County

Yates has a history of racially discriminatory use of peremptory challenges. Kandies' trial lawyer, Clark Bell, referred to this history during his first *Batson* objection, stating: "We further submit . . . of an evidentiary nature, in my ten years of practice . . . it has not been my experience that he has left a single minority member on the jury that he has picked." (JS Tr. at 123) Yates did not dispute counsel's observation about his unbroken ten-year history of racial exclusion.[26]

---

(JS Tr. 134), Bryant (JS Tr. 449-50), Seiver (JS Tr. 883), Moggio (JS Tr. 906), Summey (JS Tr. 460), Liles (JS Tr. 462), Shields (JS Tr. 567), Leonard (JS Tr. 574), Hutchinson (JS Tr. 670), Moore (JS Tr. 756), F. Martin (JS Tr. 809), Sillmon (JS Tr. 848-49), J. Steele (JS Tr. 930), Puckett (JS Tr. 940), and Turner (JS Tr. 972). The black venire members so questioned were: Alston (JS Tr. 144-45), Massey (JS Tr. 119), Coley (JS Tr. 585-86), Richardson (JS Tr. 178), and Wilson (JS Tr. 743).

[25] The following black prospective jurors were questioned using some formulation of the "duty to impose death" script: Randleman (JS Tr. 86), Jinwright (JS. Tr. 116-17), Rawlinson (JS Tr. 137-38), McClure (JS Tr. 152), Campbell (JS Tr. 571), and Hines (JS Tr. 593-94). The white venire members so questioned were: Glass (JS Tr. 148-49), Covert (JS Tr. 454), Judge (JS Tr. 732-33), and Kinnecom (JS Tr. 157).

[26] Bell's contemporaneous observation concerning Yates' long-standing history of striking all eligible black venire members is relevant to Kandies' claim. Bell's affidavit regarding his observation is attached. The state never disputed Bell's observation either at trial or on appeal. Additional evidence, including the observations of other Randolph County attorneys and the opinions of the experts, confirms Bell's contemporaneous observation. Finally, respondent could have but did not depose Bell, thereby waiving any objection to his comment.

Examination of Yates' other cases in the 1990s reinforces the picture of racially discriminatory jury selection. In the 1990s, four other Randolph County cases resulted in death sentences: Kenneth Rouse, James Williams, Gary Trull, and Ronald Poindexter. In each of these cases, Yates struck 100% of the eligible black venire members. (Ex. 1, Grosso and O'Brien Affidavit, Table 1; Ex. 4, Affidavit of Barrie Wallace at ¶8) Yates struck black venire members at a rate of approximately three times the rate at which he struck non-black venire members.[27] As a result, these four defendants were convicted and sentenced to death by all-white juries.

In addition to this history of striking a disproportionate percentage of the eligible black venire members, two trial courts found Yates impermissibly used race as a factor in exercising peremptory challenges. Gary Trull was tried capitally in Randolph County in 1996, two years after Kandies' trial. Yates conducted jury selection personally. Yates attempted to peremptorily strike every eligible black venire member. Trull objected under *Batson* after the first black venire member was struck, but the court denied the objection. (Ex. 7, *Trull* Jury Selection Tr. 316-22) When Yates sought to strike the next eligible black venire member, Trull again objected under *Batson*. (Ex. 8, Order, *State v. Trull*) After observing this potential juror had a solid employment, family, and church history, and repeatedly stated he would fairly follow the law, the trial court "note[d] specifically that the District Attorney has spent noticeably more time conferring [with] a law enforcement officer sitting at the State's table and requestioning this potential juror on things that he had already questioned him about more so than he has any other time during the entire selection process." (Ex. 8, Order, *State v. Trull*) In light of all the evidence, the court found "that the exercise of – attempted exercise of this peremptory challenge is pretextual, whether intentional or not, surely remains pretextual, and the defendant's objection to the State exercising a peremptory challenge as to this juror is sustained."[28] *Id*. Thus, the black venire member was

---

[27] In *Rouse*, the disparity between Yates' strikes of black venire members versus white venire members was 2.9:1. In *Williams*, it was 3.1:1. In *Trull*, it was 3.3:1. (Ex. 1, Grosso and O'Brien Affidavit, Table 1) In *Poindexter*'s 1999 capital trial, it was 3.3:1. (Ex. 4, Barrie Wallace Affidavit at ¶8, Tab B)

[28] A trial court again found Yates used race as a factor in exercising a peremptory challenge against a black venire member in *State v. Johnston*, 2000 CRS 000828. In this case, the defendant, who was black, was tried capitally in

seated as an alternate only after the *Batson* objection was sustained.

Finally, attorneys who have practiced in District 19B for decades have recognized the role race has played in Yates' use of peremptory strikes in selecting juries. These observations are compelling.

As noted above, during Mr. Kandies' trial in Randolph County in 1994, trial counsel referred to the prosecution's history of discriminatory use of peremptory challenges upon making his first *Batson* objection. (JS Tr. at 123) In a 2006 affidavit, Clark Bell, who represented Mr. Kandies at his capital trial, amplified his statements at trial and stated:

> Early in the jury selection process, I noticed Mr. Yates was exercising peremptory challenges against African Americans. This development did not surprise me as I had been practicing in Randolph County for a number of years and knew, both from personal experience and from discussions with other local criminal defense lawyers, Mr. Yates tended to use peremptory challenges against African Americans. I recall that I made a number of objections to this practice under *Batson v. Kentucky*. At one point, I told the trial court, as a basis for one of my Batson objections that I had been practicing in Randolph County for about ten years and that Mr. Yates had never left an African American on one of my juries. I did not make this statement as an off-hand remark. Rather, I made it based upon my personal experience defending criminal cases in which Mr. Yates was the prosecutor. It was true when I made it.

(Ex. 9, Clark R. Bell Affidavit at ¶¶4-5)

The experience of this attorney who has practiced in Randolph County with Yates for many years is not isolated. Rather, attorneys who have practiced in this jurisdiction believe Yates has a history of seeking to eliminate non-white jurors, especially in the 1990s. Each of these attorneys has had extensive opportunity to view Yates' jury selection behavior, and all agree he had demonstrated a propensity towards striking jurors on the basis of race. Attorney Franklin E. Wells, Jr., has practiced law in Randolph County for twenty years. (Ex. 10, Frank Wells Affidavit at ¶2) In his years of practice, Wells has noticed Yates' pattern of excluding blacks from jury service in criminal cases.

> I tried several capital cases before juries against Mr. Yates and have observed or been aware of a number of other jury trials he has handled. In my opinion, it has been

---

the homicide of a Montgomery County magistrate, who was white. During capital jury selection, Yates exercised a peremptory challenge against a black prospective juror. Trial counsel made a *Batson* objection, and the trial court found that Yates' reasons for striking the black prospective juror were not race neutral. The trial court further found that Yates had already exercised peremptory challenges against two other black prospective jurors. Yates accepted the black prospective juror only after the trial court stated that it would declare a mistrial if Yates exercised a peremptory challenge against the prospective juror. (Ex. 13, *State v. Johnston* newspaper article)

19

accepted by most courthouse observers that Mr. Yates prefers not to have African Americans serve on the juries in his cases and that he does what he can to prevent them from sitting on his juries. This was especially true during the 1990s.

I have noticed Mr. Yates' tendency to remove otherwise qualified African Americans from juries with peremptory challenges. Given the small number of African Americans in Randolph County and the correspondingly small number of African Americans in the usual jury venire, it has been relatively easy for Mr. Yates to remove most qualified African Americans from his capital juries. …

...

In my opinion, Mr. Yates, in the past, has preferred to keep otherwise qualified African Americans from sitting on juries in his cases through the use of peremptory challenges. I also believe this practice is well-known to other criminal defense lawyers in Randolph County.

(Ex. 10, Wells Affidavit at ¶¶3-4, 6) *See also* Ex. 11, Affidavit of C. Pierre Oldham at ¶5 ("[I]t was noticeable that the race of a particular juror would play a role in the way in which he selected juries and exercised peremptory challenges."); Ex. 9, Bell Affidavit at ¶¶3, 7.

Finally, Richard Roose, who served as an assistant district attorney under Yates for more than decade from 1979 until 1993, recalls:

I tried several cases before juries with Mr. Yates and observed or was aware of a number of other jury trials he handled. In my opinion, it was noticeable that he preferred not to have African Americans on the juries in his cases. He and I never discussed the issue, but I observed his tendency to remove otherwise qualified African Americans with peremptory challenges.

After I left the Office of the District Attorney, I handled a large number of criminal matters in superior court, many of which were tried to a jury. Based on my personal experiences, my observations, and my discussions with other criminal defense lawyers, Mr. Yates continued to have a marked tendency to remove qualified African Americans from the juries when he tried cases. In my opinion, it was noticeable that the race of a particular juror would play a role in the way in which he selected juries and exercised peremptory challenges.

(Ex. 12, Affidavit of Richard Roose at ¶¶2-4)

This "widely know evidence" of "the appearance of discrimination" by Yates is persuasive. *Miller-El II*, 545 U.S. at 253. This suspicion of discriminatory intent rises to an inference that the state court unreasonably ignored. *Id*. at 254.

## **Conclusion**

For the reasons stated herein, Jeffrey Kandies is entitled to a writ of habeas corpus.

Respectfully submitted, this the 8th day of September, 2010.

<div style="margin-left: 40%;">

/s/ M. Gordon Widenhouse, Jr.
M. Gordon Widenhouse, Jr.
N.C. Bar #10107
312 West Franklin Street
Chapel Hill, North Carolina 27516
Telephone: (919) 967-4900
Telefax:     (919) 967-4953


/s/ Shelagh Rebecca Kenney
Shelagh Rebecca Kenney
N.C. Bar #28202
Center For Death Penalty Litigation
201 West Main Street, Suite 301
Durham, North Carolina 27701
Telephone:  (919) 956-9545
Telefax:     (919) 956-9547

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Edwin Welch, Special Deputy Attorney General, State of North Carolina.

Respectfully Submitted,


/s/ Shelagh Rebecca Kenney
Shelagh Rebecca Kenney