# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### WINSTON-SALEM DIVISION

### FILE NO. 1:99CV00764

| | | |
|---|---|---|
| **JEFFREY CLAYTON KANDIES** | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **RESPONSE BRIEF** |
| | ) | |
| **GERALD BRANKER, Warden,** | ) | |
| **Central Prison** | ) | |
| **Raleigh, North Carolina,** | ) | |
| Respondent. | ) | |

TO:  THE  HONORABLE  WALLACE  W.  DIXON,  UNITED  STATES
MAGISTRATE JUDGE

NOW COMES  respondent by his counsel, the Honorable Roy Cooper, Attorney General,

and the undersigned Special Deputy Attorney General Edwin W. Welch, respectfully submitting

this Response Brief as authorized by the Court's Minute Order of 3 September 2010.

**I.      UNDER AEDPA, THIS COURT MAY NOT USE HABEAS
        REVIEW AS A VEHICLE FOR SECOND-GUESSING
        REASONABLE DECISIONS OF THE SUPREME COURT
        OF NORTH CAROLINA (I.E., THE DECISION TO REJECT
        PETITIONER'S <u>BATSON</u> CLAIM).**

1.      **The AEDPA standard of review is well-known to this Court.**  See <u>Suggs v.
<u>McNeil</u>, 609 F.3d 1218 (11th Cir.  2010), stating the following law applicable to the case at bar.

> **The Act imposes a "highly deferential standard for evaluating
> state-court rulings."** <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24, 123 S. Ct. 357,
> 360, 154 L. Ed. 2d 279 (2002).  **It requires that we "give[] the benefit of the
> doubt" to the decision of the state court.** <u>Id.</u>  "More than once the Supreme
> Court has instructed lower federal courts that the statute requires more than mere
> error, and more even than clear error, before federal habeas relief may be issued."
> <u>Rutherford</u>, 385 F.3d at 1307.  **As the Supreme Court recently reminded, the
> Act "prevents defendants--and federal courts -- from using federal habeas**

**corpus review as a vehicle to second-guess the reasonable decisions of state courts.**" <u>Renico v. Lett</u>, 559 U.S. __, 130 S. Ct. 1855, 1866, 176 L. Ed. 2d 678 (2010).

609 F.3d at 1227 (emphasis added). <u>See also</u> <u>Watkins v. Thaler</u>, 2010 U.S. Dist. LEXIS 8682 at *9-10 (N.D. Tex. Jan. 12, 2010)(Under <u>Miller-El</u>, state court findings of fact concerning <u>Batson</u> claim are entitled to a presumption of correctness; AEDPA barred relief only if Texas Court of Criminal Appeals' finding that trial court's rejection of <u>Batson</u> challenges "was not 'clearly erroneous' was itself 'an unreasonable determination of facts in light of the evidence presented in the State court proceeding.' 28 U.S.C. § 2254(d)(2)."; "Because Watkins has not satisfied this heavy and demanding burden, relief on his <u>Batson</u> claim should be denied."), <u>recommendation accepted and habeas petition dismissed</u>, 2010 U.S. Dist. LEXIS 8679 (N.D. Tex. Feb. 1, 2010).

II. **<u>MILLER-EL II</u> ADDS NO NEW LEGAL REQUIREMENTS AFFECTING THIS COURT'S REVIEW OF THE UNANIMOUS DECISION OF THE SUPREME COURT OF NORTH CAROLINA REJECTING PETITIONER'S <u>BATSON</u> CLAIM.**

2. **<u>MILLER-EL II</u> created no new "<u>Batson</u> law."** <u>See</u> <u>Harden v. Branker</u>, 2009 U.S. Dist. LEXIS 89037 at *5-6 (W.D.N.C. Sept. 9, 2009)("<u>Snyder</u>, <u>Collins</u>, and <u>Miller-El</u> do not constitute new law. <u>See</u> <u>Golphin v. Branker</u>, 519 F.3d 168, 186 (4th Cir. 2008) ('<u>Miller-El</u> did not alter <u>Batson</u> claims in any way.').").

3. **The mandate of the United States Court of Appeals for the Fourth Circuit imposed no new "<u>Batson</u> law" requirements on this Court.** <u>See</u> <u>United States v. Barnette</u>, 2010 U.S. Dist. LEXIS 50729 (W.D.N.C. May 19, 2010), stating the following law applicable to the case at bar:

The threshold determination for this Court is to interpret the Fourth

2

Circuit's mandate. When the United States Supreme Court granted certiorari, vacated the judgment, and remanded Barnette's case to the Fourth Circuit "for further consideration in light of <u>Miller-El v. Dretke</u>,"[1] <u>Barnette</u>, 546 U.S. at 803, the Court was not taking the position that <u>Miller-El</u> actually affected the outcome of <u>United States v. Barnette</u>, 390 F.3d 775 (4th Cir. 2004). <u>See</u> <u>United States v. M.C.C. of Florida, Inc.</u>, 967 F.2d 1559, 1562 (11th Cir. 1992) (discussing the parameters of the mandate when a superior court remands for further consideration in light of a new legal decision). Instead, it was instructing the Fourth Circuit to make that determination. <u>See id.</u> In turn, the Fourth Circuit turned that task over to this Court when it remanded Barnette's case "for further consideration in light of <u>Miller-El</u> . . . ."[2] <u>United States .v. Barnette</u>, No. 02-20, 2007 U.S. App. LEXIS 30617 (4th Cir. filed Aug. 28, 2007). Therefore, the mandate is limited in nature. <u>See</u> <u>M.C.C. of Florida, Inc.</u>, 967 F.2d at 1562. It does not require the Court to nullify all prior proceedings. <u>See id.</u> **It merely requires the Court to reconsider its opinion with respect to whether Barnette proved purposeful discrimination at his <u>Batson</u> hearing in light of the law set forth in <u>Miller-El</u>.** <u>See</u> id. **Consequently, this Court is free to retain any or all of its prior findings of fact and conclusions of law with respect to Barnette's <u>Batson</u> claim that, upon reconsideration, it determines to be unaffected by <u>Miller-El</u>. []** <u>See id.</u>

  . . . .

Moreover, although the Supreme Court considered a variety of evidence in finding purposeful discrimination in Miller-El's case, **<u>Miller-El</u> itself did not change the nature, quantity, or quality of the evidence that a trial court may consider when assessing the plausibility of a prosecutor's explanations for his peremptory strikes under <u>Batson</u>. In other words, it did not announce new law; it merely applied existing law under <u>Batson</u> to the facts of the case before it. <u>See</u> <u>Golphin v. Branker</u>, 519 F.3d 168, 186 (4th Cir. 2008) ("<u>Miller-El</u> did not alter <u>Batson</u> claims in any way.");** <u>Murphy v. Dretke</u>, 416 F.3d 427, 439 (5th Cir. 2005) (explaining that "[t]he Court did not announce any new elements or criteria for determining a <u>Batson</u> claim, but rather made a final factual and evidentiary determination of that particular petitioner's <u>Batson</u> claim"). While <u>Miller-El</u> retained <u>Batson</u>'s requirement that the trial judge assess the plausibility of the prosecutor's explanation for striking a juror "in light of all of the evidence with a bearing on it[]," <u>Miller-El</u>, 545 U.S. at 252 (citing <u>Batson</u>, 476

---

[1] As this Court knows, this is the same thing the United States Supreme Court did with Petitioner Kandies' petition for writ of certiorari.

[2] Again, as this Court knows, this is the same thing the United States Court of Appeals for the Fourth Circuit did in Petitioner Kandies' case.

U.S. at 96-97), **it did not shift the burden from the defendant to prove purposeful discrimination**, see Collins, 546 U.S. at 338.

2010 U.S. Dist. LEXIS 50729 at *18-26 (emphasis added).

**III.     MATTERS OF RECORD SHOW MANY FACTUAL DISTINCTIONS BETWEEN MILLER-EL II AND KANDIES THAT DEBUNK PETITIONER'S ASSERTIONS THAT MILLER-EL II SHOWS THE SUPREME COURT OF NORTH CAROLINA UNREASONABLY REJECTED HIS BATSON CLAIMS.**

**4.     Dispositive factual distinctions between Miller-El II and the case at bar ("Kandies") are shown by matters of record (e.g., deposition testimony, affidavits, and the trial transcript).**

a.     The following statement in Golphin quotes Miller-El II's comments focused on unacceptable practices of the Texas prosecutor that were not practices of the North Carolina District Attorney in Kandies:

> [M]ost importantly, the Court relied heavily on **"broader patterns of practice during the jury selection."** Id. at 253. The prosecution had used the technique of a "jury shuffle" to move black venirepersons to the back of the venire panel; **read a "graphic script" of the death penalty to black venire members** in order to get them to equivocate on the death penalty; [Footnote 9 omitted] and **used "trickery" in the form of questions about mandatory minimum sentencing for first degree murder**. [Footnote 10: The trick question worked in the following manner. The prosecution would ask a juror what he/she believed should be the mandatory minimum sentence for murder. It first told some jurors that Texas law provided a minimum of five years. For other jurors, the prosecution would not mention the five-year minimum. If a juror then offered a term above five years, the prosecution would move to strike that juror for cause. Miller-El II, 545 U.S. at 261. **The State conceded that this tactic was used to trick jurors and create cause to strike. Id.**] Id. at 253-63. The Court found that 53% of black jurors received the graphic script, while only 6% of white jurors received it. Id. at 255-56. As for the trickery, 27% of nonblacks who indicated skepticism about the death penalty received the "trick" question, while 100% of black jurors hesitant about the death penalty were asked the trick question. Id. at 264. Importantly, **the State never "denied that disparate lines of questioning**

4

**were pursued.**" Id. at 265.  The Court then arrived at its final piece of evidence:

> There is a final body of evidence that confirms this conclusion. **We know that for decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systemically excluding blacks from juries**.

Id. at 263.

519 F.3d at 185 (emphasis added).  Accord Murray v. Schriro, 2008 U.S. Dist. LEXIS 52516 (D.

Ariz. May 30, 2008)(death penalty decision rejecting allegation that trial court improperly denied

Batson motion),  stating following comments equally applicable to the case at bar:

> The factual circumstances of the present case are much less drastic than those present in cases like Miller-El and Kesser.  In Miller-El, there was evidence of **jury shuffling**, which placed white jurors ahead of African-American jurors, and **disparate questions** regarding the ethnicity of the prospective juror. Miller-El II, 545 U.S. at 253-263.   There was also evidence that a **general prosecutorial policy existed by which African-Americans were not to be seated on juries.** Id. at 253.  These circumstances did not exist in Petitioner's case.

2008 U.S. Dist. LEXIS 52516 at *55-56 (emphasis added).

> b.     The following quotation from Miller-El v. Dretke, 545 U.S. 231, 125 S. Ct. 2317,

162 L. Ed. 2d 196 (2005), shows the existence of inappropriate policies in the Dallas District

Attorney's office that have never been present in North Carolina District Attorney Yates' office:

> **There is a final body of evidence that confirms this conclusion.  We know that for decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systematically excluding blacks from juries,** as we explained the last time the case was here. "Although most of the witnesses [presented at the Swain hearing in 1986] denied the existence of a systematic policy to exclude African-Americans, others disagreed.  **A Dallas County district judge testified that, when he had served in the District Attorney's Office from the late-1950's to early-1960's, his superior warned him that he would be fired if he permitted any African-Americans to serve on a jury.  Similarly, another Dallas County district judge and former assistant district attorney from 1976 to 1978**

5

testified that he believed the office had a systematic policy of excluding African-Americans from juries.

        "Of more importance, the defense presented evidence that the District Attorney's Office had adopted a formal policy to exclude minorities from jury service. . . . A manual entitled 'Jury Selection in a Criminal Case' [sometimes known as the Sparling Manual] was distributed to prosecutors. It contained an article authored by a former prosecutor (and later a judge) under the direction of his superiors in the District Attorney's Office, outlining the reasoning for excluding minorities from jury service. Although the manual was written in 1968, it remained in circulation until 1976, if not later, and was available at least to one of the prosecutors in Miller-El's trial." Miller-El v. Cockrell, 537 U.S., at 334-335, 154 L. Ed. 2d 931, 123 S. Ct. 1029. [Footnote 37 omitted].

545 U.S. at 263-64, 125 S. Ct. at 2338-39, 162 L. Ed. 2d at 228-29 (emphasis added).

     5.     **Un-controverted deposition testimony and affidavits of officers of the Court unequivocally show that the unacceptable practices in the Dallas District Attorney's Office were <u>not</u> present in District Attorney Yates' office when defendant was tried**.

     a.     Unlike the Dallas District Attorney, District Attorney Yates did <u>not</u> give his assistant district attorneys "any training on jury selection" or "training in the office about <u>Batson</u> and how to deal with <u>Batson</u>." Gregson Dep. T, p. 46. More specifically, he has <u>not</u> "at any time" given "any classes to ... members of [his] staff intended to teach them how to exclude potential jurors based upon their race." Gregson Dep. T, p. 52. District Attorney Yates, in all the years he has been the District Attorney, has <u>never</u> given "any training for staff attorneys on jury selection techniques or skills or the law covering selection". Yates Dep. T, p. 49. This type of training is generally done by the Conference of District Attorneys. <u>Accord</u> Yates Affidavit of 14 May 2007 answering Interrogatory No. 3 (Doc 69, p. 9)(He did not provide "training and instruction, formal or informal, either written, oral, or by electronic means regarding jury

selection to the attorneys in his office.").

b.     Unlike the Dallas District Attorney, District Attorney Yates has not published "at any time a handbook containing suggested methods of excluding potential jurors based upon their race." Gregson Dep. T, p. 52. Accord, Yates Dep. T, p. 69.

c.     During Petitioner's trial, District Attorney Yates did not say anything that "manifested an intention to exclude potential black jurors based upon their race," Gregson Dep. T, pp. 51-52. Furthermore, he has "never" said anything that manifested such an intention. Id.

d.     Assistant District Attorney Gregson has witnessed District Attorney Yates "accept and seat numerous minority jurors in [many] capital cases." Gregson Dep. T, p. 53. N.B., Assistant District Attorney Gregson has affirmatively asserted:

> I have extensive experience prosecuting cases with Mr. Yates and witnessing him select juries. I have prosecuted approximately fifteen jury trials with Mr. Yates and at least ten of those trials were capital murder cases. **I have never seen any evidence nor heard Mr. Yates even hint at considering a juror's race as a actor in either selecting or striking a juror.** In my experience, Mr. Yates has been entirely appropriate in his consideration of a juror's fitness to serve, legally and ethically. Furthermore, I have personally witnessed him accept and seat numerous minority jurors in capital cases.

Gregson Affidavit dated 26 June 2007 (Doc 7-2)(emphasis added).

e.     Neither District Attorney Yates nor former Assistant District Attorney Elizabeth Toomes "ever presented lectures or speeches, or written articles or papers regarding jury selection in criminal cases." Yates Affidavit of 14 May 2007 answering Interrogatory No. 2 (Doc 69, p. 9).

6.     **Unlike in <u>Miller-El II</u>, no testimony has been offered or proffered by any current or past member of District Attorney Yates' office showing that District Attorney**

7

**Yates had a plan to exclude potential jurors from juries based on their race.**

        a.       Indeed, officers of the Court have made sworn statements under oath that affirmatively deny the existence of any such unacceptable animus.  E.g., in addition to sworn statements of Assistant District Attorney Gregson affirmatively asserting that District Attorney Yates never said anything manifesting an intent to excuse any potential jurors based on their race, please <u>see</u> the 27 Feb 2008 Affidavit of former Assistant District Attorney Elizabeth M. Toomes (Doc 83-3), stating:

> I was also aware that the <u>Batson</u> challenge had been made.  Consequently, I carefully watched and listened to District Attorney Yates both at trial and during my discussions with him during the trial.  I neither heard in comments nor saw in his actions anything manifesting a desire to challenge any juror based on their race.  **Either in the aforementioned trial or in the office, I have never known him to express or otherwise manifest a desire to challenge a juror based on the juror's race.**

(Emphasis added).

        b.       Importantly, please <u>see</u> Doc. 105 in the Court's files (United States Magistrate Judge Russell A. Eliason's Order of 29 January 2008)(N.B., pp. 4-8), hereby incorporated by reference, which notes the following, <u>inter alia</u>:

> (1)    [T]he Court is informed that Petitioner does not desire to take the deposition of Petitioner's trial counsel.  Therefore, the Court deems that any issue concerning the conclusion claim that the state prosecutor, Mr. Yates, had never selected a black juror has become moot and will not be further considered as a ground for relief."

Doc. 105, p. 4.

> (2)    [T]he trial records with respect to the jury selection process are no longer extant and, therefore, the matter of whether the records were used in a discriminatory manner cannot be further pursued.  While Petitioner argues that the Court should take this as some evidence that Mr. Yates used them for a discriminatory reason, the Court

8

cannot find that the absence of evidence would necessarily lead one to that conclusion. Moreover, it is not entirely clear that discovery should have been permitted on that issue in the first instance. Nothing in the trial court record indicates a suspicion or implausibility concerning the use of the records as a basis for the peremptory challenge.

Doc. 105, p. 5.

    (3)    [I]t also appears in the record that Yates received some information from the High Point Police Department which indicated that some individuals, and perhaps the two in question, would not make good jurors. ... [T]his might corroborated a finding that discriminatory intent was not the basis of the district attorney's decision.

Doc. 105, p. 7.

    (4)    Respondent ... shows that unlike in <u>Snyder</u>, the trial judge here accepted the additional non-suspect reasons for the peremptory challenges, and therefore, as in ] <u>Golphin</u>, Petitioner has failed to show that the state court's determination of the issue was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

Doc. 105, p. 8.

**IV.    THIS COURT, THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT, AND THE SUPREME COURT OF NORTH CAROLINA HAVE ALREADY CAREFULLY EXAMINED RELEVANT <u>VOIR DIRE</u> AND <u>BATSON</u> CLAIMS AND ISSUED THOROUGH DECISIONS ARTICULATING SOUND REASONS FOR REJECTING PETITIONER'S <u>BATSON</u> CLAIMS.**

    7.    **The aforementioned experienced courts have carefully examined and rationally rejected Petitioner's <u>Batson</u> claim after reviewing a proverbial mountain of information of record.**

    a.    Rather than redundantly repeating for the busy Court the extended legal and factual analysis, please <u>see</u> the discussion of <u>Batson</u> claims in <u>Kandies v. Polk</u>, 385 F.3d 457 (4th

9

Cir. 2004)[3], <u>Kandies v. Lee</u>, 252 F. Supp. 2d 252, 2000 U.S. Dist. LEXIS 22379 (14 December 2000), <u>Kandies v. Lee</u>, 252 F. Supp. 2d 252, 2003 U.S. Dist. LEXIS 4536 (2003)(M.D.N.C., 4 March 2003), <u>State v. Kandies</u>, 350 N.C. 843, 539 S.E.2d 640 (1999).

      b.     Please also consider all briefs, answers, responses, etc., previously submitted to this Court that discuss Petitioner's <u>Batson</u> claim - - all hereby incorporated by reference.  E.g., <u>see</u> Doc. 96, pp. 5-7 (discussion and quotation of District Attorney Yates' and Assistant District Attorney Gregson's key deposition testimony); Doc. 96, pp. 9-12 (the law concerning requests for copies of criminal records of prospective jurors); Doc. 96, pp. 12-14 (Assistant District Attorney Gregson's sound reasons for challenging a black minister in another case, i.e., <u>State v. Trull</u>); Doc. 96, pp. 14-15 (not unreasonable explanation of reasons for not being able to produce various documents and information concerning the effect of District Attorney Yates' vehicle accident); Doc. 96, pp. 16-19 (Assistant District Attorney Gregson's and Detective Mark B. McNeill's not unreasonable discussion of the value of discussing with police officers information they may know concerning potential jurors); Doc. 96, pp. 19-20 (information concerning percentage of minorities in Randolph County); Doc. 96, pp. 21-24 (<u>Snyder</u> distinguished); Doc. 100, pp. 1-4 (quotations of relevant commentary by District Attorney Yates and Assistant District Attorneys Gregson and Toomes and significant findings of the trial court concerning the challenges to potential jurors Rawlinson and McClure); Doc. 100, pp. 4-11 (distinguishing <u>Snyder</u>, noting that it is not a dispositive case that should be considered when evaluating the challenges to potential jurors Rawlinson and McClure).

---

[3] **N.B., the extensive discussion of jurors at 385 F.3d at 473-79 and the discussion at 385 F.3d at 495-96.**

10

c.      Considering the content of these decisions and other matters, the absence of any clear and convincing newly surfaced evidence showing <u>Batson</u> error, and other matters presented to this Court since the case was remanded to the Court, it is clear the <u>Batson</u> claims have been carefully reviewed and unanimously correctly rejected by the trial court, the Justices of the Supreme Court of North Carolina, and members of the federal judiciary identified in the aforementioned decisions - - and that nothing in <u>Miller-El II</u> shows that these respected jurists were all wrong.

**V.    JUDGE TRAXLER'S CONCURRING OPINION IN <u>KANDIES</u> CORRECTLY ASSESSED AND REJECTED PETITIONER'S ASSERTIONS THAT THE STATE SHOULD NOT BE PERMITTED TO JUSTIFY A STRIKE (E.G., THE STRIKE OF PROSPECTIVE JUROR RANDLEMAN) WITH INFORMATION NOT IN THE RECORD.  <u>SEE</u> <u>KANDIES</u>, 385 F.3D AT 495-96.**

8.      **The State's reliance on Randleman's criminal history was a perfectly appropriate race-neutral reason for exercising a peremptory challenge.**  Judge Traxler correctly addressed this Court's concerns as follows:

> Randleman's juror information form indicated that she had not been convicted of a crime when, in truth, the State's record check listed convictions for writing bad checks and committing speeding violations.  Unquestionably, a prospective juror's criminal record alone, even if there was no failure to disclose, is race-neutral on its face.  <u>See</u> <u>Matthews</u>, 105 F.3d at 917-18.  Kandies has not shown that any of the prospective Caucasian jurors he believes held similar views on the death penalty had a criminal record or, if so, failed to disclose it.  I see no clear and convincing evidence that the State struck Randleman based on race.
>
> **Kandies counters that because the prosecutor did not introduce evidence of Randleman's criminal history, the basis articulated by the State was not supported by the record and cannot serve as justification for a peremptory strike.  This argument, in my view, bungles <u>Batson</u>'s analytical framework.**  It implies that the State, in coming forward with its race-neutral justification at the second stage of <u>Batson</u>, bears some evidentiary burden.

11

[Footnote 4 omitted]  That is not accurate. The State's burden at that stage is merely to articulate a facially neutral reason for having exercised a peremptory strike.  The prosecutor, in other words, simply must come up with a reason "based on something other than the race of the juror." Hernandez, 500 U.S. at 360.  This is not a tall order, given that "the second step of this process does not demand an explanation that is persuasive or even plausible. " Purkett, 514 U.S. at 767-68.  As long as the State comes up with a reason -- anything other than a mere denial of discriminatory intent -- it has done all that is required at the second stage.  See id. at 769.  Whether the trial court believes the reason actually motivated the prosecutor is a question that must be answered at the third stage of the Batson analysis, and even then it is the opponent of the strike who shoulders the burden of proof.  See id. at 768.  Thus, the State's reliance on Randleman's criminal history was a perfectly appropriate race-neutral reason for exercising a peremptory challenge, and it was Kandies, not the State, who was required to demonstrate otherwise.  Kandies has not produced any clear and convincing evidence to rebut the state court's factual determination in this regard.

385 F.3d at 495-96 (emphasis added).

> 9.    **The Supreme Court of North Carolina not unreasonably rejected Petitioner's assertion that "the trial court erred in denying his motion to require the State to produce copies of criminal records of prospective jurors."**

> a.    The Supreme Court of North Carolina stated then existing law as follows:

> > **[T]here is no statutory requirement that a prosecutor must reveal juror information in his possession.**  Section 15A-903 of the North Carolina General Statutes describes types of information obtained by the State that may be subject to disclosure.  No mention is made of criminal records of prospective jurors. N.C.G.S. § 15A-904 pertains to information not subject to disclosure; it provides in pertinent part that except as otherwise required by N.C.G.S. § 15A-903, production of reports, memoranda, or other internal documents made by the State or persons acting in its behalf in connection with the prosecution of the case is not required.  Where a statute expressly restricts discovery, as does N.C.G.S. § 15A-904(a), the trial court has no authority to order discovery.  State v. Hardy, 293 N.C. 105, 125, 235 S.E.2d 828, 840 (1977).

> > Further, the district attorney is an officer of the court and, as such, is sworn to represent the State honestly and to the best of his ability.  Absent evidence to the contrary, it is not unreasonable for the trial court to assume that the prosecutor is telling the truth with regard to the criminal records of prospective jurors.

> **Finally, once the prosecutor has articulated a nonracial explanation for each challenged peremptory strike, the burden shifts to the defendant to introduce evidence that the State's reasons are a pretext**. <u>Robinson</u>, 330 N.C. at 16, 409 S.E.2d at 296. Thus, the ultimate burden of rebutting the State's representations and proving purposeful discrimination lies with the defendant. Defendant had sufficient opportunity to produce evidence that the prospective jurors in question did not have criminal records. He could have obtained a record check himself or secured a court order requiring production of these documents. There were resources available to defendant to rebut the State's explanations, and he chose not to utilize them.
>
> **Absent authority mandating that the trial court allow defendant to discover these documents and absent any evidence produced by defendant questioning the validity of the prosecutor's representations, it cannot be said that the trial court abused its discretion in denying defendant's motion.**

342 N.C. at 437-38, 467 S.E.2d at 77 (emphasis added).

b.      Petitioner has failed to cite to the Court any decision of the Supreme Court of the United States holding that the trial court committed federal constitutional error by denying Petitioner's motion to require the State to produce copies of criminal records of prospective jurors. No such holding exists. Furthermore, when Petitioner was tried, no statute mandated disclosure of such information. <u>See</u> <u>Brown v. State</u>, 982 So. 2d 565, 585-86 (Ala. Crim. App. 2006)(rejecting a similar argument, surveying current law concerning such requests by trial counsel, and stating, <u>inter alia</u> that the "State has no duty to disclose information concerning prospective jurors," "[s]everal jurisdictions have similarly held," and "the state has no duty to disclose information that is available to the appellant from another source."), <u>cert. denied</u>, 128 S. Ct. 1893, 170 L. Ed. 2d 763 (2008).

c.      Please consider information and argument provided the Court in the State's Motion to Expand the Record filed 5 March 2008 (Doc 83, presenting Docs 83-2 to 83-4, hereby incorporated by reference), i.e., affidavits and records showing that Ms. Randleman did <u>not</u>

13

correctly report prior convictions discovered by the prosecutors, and that District Attorney Yates

had a good faith basis for his peremptory challenge of Ms. Randleman unrelated to her race.

**VI. CONSIDERABLE INFORMATION PROVIDED BY DISTRICT ATTORNEY YATES AND ASSISTANT DISTRICT ATTORNEY GREGSON SHOWS THAT THE STATE'S PEREMPTORY CHALLENGE OF A BLACK MINISTER IN <u>STATE v. GARY ALLEN TRULL</u> WAS BASED ON FACTORS UNRELATED TO HIS RACE.**

10. **Assistant District Attorney Gregson has provided a reasonable explanation for the State's peremptory challenge of the minister, an alternate juror in <u>Trull</u>**. When deposed, he stating the following under oath in response to Petitioner's counsel's questions:

> What I recall is that the facts on <u>Trull</u> were very important. Mr. Trull had received a life sentence for raping -- a very brutal rape over in Guilford County. He was paroled, and he either married the girl or -- while he was still in prison or soon as he got out, who was involved in prison ministry. And they were instrumental in getting him released. Well, the victim had moved out from her parents' home a few weeks before. She ended up living beside Mr. Trull, unbeknownst. Mr. Trull kidnapped her, took her into the woods, tied her to a tree, raped her, and cut her throat. And it was one of the first cases that was pretty much DNA. And back then DNA took about a year -- well, took six months or something. Well, her father wanted to kill Trull. We knew -- we knew it was Trull. And he was out. He was never arrested until we got the DNA results back. And it was one of the most difficult times I've ever had in my whole prosecution. **I had Mr. Dixon, the victim's father, calling me at night. He would call me close to midnight, crying and threatening Mr. Trull. And -- and we literally had officers watching Mr. Dixon so he wouldn't kill Mr. Trull before we got -- got him charged.** And so when the juror came up and was involved -- the juror in the question is -- was involved in prison ministry -- **Mr. Dixon was sitting behind us, and they were passing us notes the whole time that I was in there for jury selection. And there was no way we were going to seat somebody involved in prison ministry. He basically blamed prison ministry for his daughter's death. [The victim's father] was very bitter and very angry.** He felt like they got a man out who was sentenced to life. And I'm telling you, we worried that he was going to kill Trull in the courtroom. He actually made threats: "If he doesn't get the death penalty, he's going to get it." And -- and we had no security; we had no -- we were wanding everybody with -- with the old-style, hand-held metal detectors, which I don't know that had ever been done

14

in Randolph County. But it was a very bad situation with Mr. Dixon. And -- and I remember Garland saying to me, "If we pick this juror, Mr. Dixon's going to kill us," or words to that effect, because he was very bitter. Which, I mean -- and I'm not -- I -- I don't want this to -- you know, I know this is going into the record. I'm not slamming Mr. Dixon at all. I mean, his daughter -- if it had not been for his younger daughter still being alive, I think he would have done something drastic to himself or to Mr. Trull. So it was a -- it was a very volatile situation, and -- and Mr. Dixon latched onto me. I was kind of like the liaison between the family for the whole trial, so he would call me many times at night, many times -- during the trial, after the trial, before the trial -- would call me -- I mean, and we would talk on the phone at 12 o'clock at night or one o'clock in the morning for an hour sometimes. So yeah, I remember it. **I remember us really struggling because the guy didn't seem too strong on the death penalty, and the prison ministry -- the guy was a minister in prison ministry.**

.  .  .  .

[And] Garland really felt he was not a strong juror. He was an alternate, I think. So it wasn't that big a deal. I remember Garland saying, "You know, I don't want to go to the mat on this, but if we don't object to him, Mr. Dixon is going to -- not kill us, but he's going to have our head." **Because Mr. Dixon was sending us notes. And I remember a note: "Prison ministry." I remember that. I remember the Dixon family** handing a note up. I mean, they were furious. And -- and so yeah, I remember it. That was the discussion.

Gregson Depo. T, pp. 40-47 (Summary of testimony, with some questions omitted; emphasis added).

11.     **District Attorney Yates also addressed the <u>Trull</u> case in his affidavit that is before the Court (Doc. 69, pp 5-6) and when being deposed (<u>see</u> Yates Depo. T, pp. 51-58)**. E.g., he pointed out that the defendant/killer in <u>Trull</u> was living next to the victim as a parolee sponsored by a church, and that the emotionally distressed and potentially dangerous victim's father was strongly opposed to a minister being on the jury. N.B., <u>nothing</u> presented to this Court by Petitioner counters the aforementioned reasonable explanations for District Attorney Yate's peremptory challenge that was intended - - for reasons unrelated to race - - to prevent the

15

minister from sitting as a juror in the <u>Trull</u> case.

**VII. DISTRICT ATTORNEY YATES AND ASSISTANT DISTRICT ATTORNEY GREGSON HAVE FULLY EXPLAINED THE REASONS WHY THE DISTRICT ATTORNEY'S FILES DO NOT NOW INCLUDE EVERY NOTE OR PIECE OF PAPER USED DURING THE 1992 JURY SELECTION PROCESS AT PETITIONER'S TRIAL.**

12.     **The reasons for the State's inability to either produce or perfectly re-construct files, notes, and documents that might have existed approximately 1 ½ decades ago are not hard to understand.**  The reasons include:  (a) the trial was in High Point, which meant that District Attorney Yates, whose office was in Asheboro, basically worked out of his car and kept files in his car, (b) District Attorney Yates has moved his office two or three times since Petitioner's trial, and, with the passage of time, some documents have been destroyed, (c) at the time of Petitioner's trial, there was no requirement to maintain all the documents, notes, etc., (d) at the time of Petitioner's trial, District Attorney Yates' office did not maintain either an inventory or log of all the contents of a capital case file, and, (e) at the time of Petitioner's trial, there was no one person responsible for keeping and organizing case files, albeit, whoever was assisting District Attorney Yates normally had the responsibility for maintaining the case file. <u>See</u> Gregson Dep. T, pp. 36-39, and 57-60; Yates' Dep. T, pp. 30-32; Yates' affidavit dated 9 July 2007 (Doc 74-2).

**VIII. DISTRICT ATTORNEY YATES HAS EXPLAINED THE REASONS WHY HE CAN NOT CLEARLY RECALL SOME INFORMATION HE KNEW WHEN PETITIONER WAS TRIED APPROXIMATELY 15 YEARS AGO.**

13.     **District Attorney Yates' explanation is clearly understandable and reasonable.**  He has stated, <u>inter alia</u>:

16

I couldn't honestly remember anything 15 years ago, so reading it didn't help much. But I looked through the case, and I assume what I said then was correct, because I can't -- **after my automobile accident [in August 2006], there's a lot of things I don't necessarily remember exactly what happened. I remember we went to High Point and we tried the case, and that's about it.**

. . . .

**But I meant 15 years ago I don't remember, and the accident didn't help me, certainly, on that, either. So, I mean, I -- I can -- I'm not sure that it's affected as far as -- there's no diagnosis I -- I can't remember anything; it just remembers that at some times -- I guess getting older, it makes it a little more difficult to remember anything**, anyway; but -- no, but, as far as -- that didn't have anything to do with it. I -- there was a -- there's a couple-week period where I don't necessarily remember what I said or did at that point. But that was because I was in the hospital, so -- and, you know, I guess maybe -- **I'm not sure I'd have perfect memory of 15 years ago even if I hadn't had the accident.**

Yates Depo. T, pp. 6-9 (emphasis added). He has confirmed in his affidavits now before this

Court that the information he has provided is true to the best of his knowledge and belief. Yates

Depo. T, p. 71.

> **IX. DISTRICT ATTORNEY YATES, ASSISTANT DISTRICT ATTORNEY GREGSON, AND FORMER DETECTIVE MCNEILL HAVE FULLY EXPLAINED THE LEGITIMATE REASONS FOR ASSISTANT DISTRICT ATTORNEY GREGSON CONTACTING THE HIGH POINT POLICE DEPARTMENT IN 1994. PETITIONER HAS NOT – AND CANNOT – SHOW THAT HIS CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE EFFORTS TO OBTAIN INFORMATION ABOUT POTENTIAL JURORS.**

14.     **Assistant District Attorney Gregson has provided a logical explanation for**

**his contacting officers he knew well at the High Point Police Department.** He has stated,

inter alia:

My recollection is that I took the list of potential jurors to the High Point Police Department and dropped it off with somebody. I think I spoke to Mark McNeill. It's logical that I would have taken it there because, when I was a police

17

attorney there, I primarily dealt with them and the vice unit because they're the ones with the most day-to-day legal issues. **The persons crime unit at that time was comprised of four or five detectives who were the old lions in the department. They were the guys who had done everything. They'd been in the various units, they'd been on the street, and they knew everybody.** I had almost daily contact with them. Now, I don't recall handing it to them, but it's logical that I would either have given it to them or to Captain Lester Fortune, the internal affairs captain who was like the troubleshooter. He and I worked very closely together. Captain Fortune was then a long-time officer who lived in the High Point area and knew a lot of people in that area. So it would have been somebody in either the persons unit or Captain Fortune. I would say that between four and six officers were in that unit. I recall that officers in the unit included Mark McNeill, Jerry Grubbs - - , who's retired, and Kim Soban, who is retired. I know there were a couple of others. I think Nick Nicholson -- whom I think is dead - - was also in that unit. I think he was a supervisor. I think there was another one, but I can't recall who it was. At this point in time, I do not recall who I gave this list to. I do not recall specifically what I asked them to do with the list of jurors, **but I know what I would have done based on what District Attorney Yates told me to do, which was to basically see if they knew anybody on the list "good or bad."** For example, **I would have been interested in knowing if a potential juror had a family member who'd been prosecuted or had a bad relationship with the police for some reason, or was a victim of a crime. That's the kind of information I expected these officers to potentially have about jurors from High Point.** I would not have expected those officers to have had any other information about jurors. I was mainly looking for involvements of potential jurors from the standpoint of the State getting a fair jury. I did no further research on potential jurors yourself, such as doing a criminal record checks or traffic check or anything of that nature. I assume that I personally got the list back at some point. I assume they called me, and that I probably drove over there before I came into work one day, since I live up that way in Sophia, and got the list.

I remember looking at the list after I got it back and thinking to myself, "Wow, that -- that wasn't very helpful." There was a few marks on the list. However, I did not read any of the marks. I remember thinking, "Well" -- you know. And District Attorney Yates had told me he didn't think he would get a lot. But it was just -- it wasn't a big deal. It was just one of those things, "Let's do it and see what we get." I [did] not [have] any discussions with anybody in the High Point police about specific jurors that I can recall. I wouldn't have known them.

Gregson Depo. T, pp. 9-19 (Summary of testimony, with some questions omitted; emphasis

added).

15.     **At his deposition, former Detective Mark B. McNeill gave testimony clearly showing the reasonable justification for asking High Point police officers in his section about their knowledge of potential jurors.**  More specifically, his uncontradicted testimony shows the following concerning officers in the persons crime unit:  (a) they were the most experience officers in the city in terms of violent crimes investigation, (b) they might have had helpful knowledge of matters concerning potential jurors because they had the opportunity to meet more people in High Point than the average officer because of their investigative efforts and arrests of people in that area, (c) they might have relevant knowledge about potential jurors that was not based on matters of record or criminal convictions, e.g., information based on knowledge acquired from certain family members, girlfriends of people arrested, or information concerning people not known by name but known by where they live, and, (d) they would frequently know information about members of the community who had been involved in criminal activity but had not been arrested.  See McNeill Depo. T, pp. 15-17.

16.     **A prosecutor may properly ask experienced law enforcement officers with considerable knowledge about members of the community for comments about potential jurors**.  No decision of the United States Supreme Court holds that a defendant's federal constitutional rights have been violated whenever a prosecutor requests that law enforcement officers review a list of potential jurors and provide information or comments regarding the wisdom of having one or more persons on the list seated as jurors in a capital case.  Furthermore, case law conveys the message that a prosecutor may request assistance of law enforcement officers when reviewing lists of potential jurors.  E.g., see Williams v. State, 271 Ga. 323, 519 S.E.2d 232 (1999), stating:

19

**Williams contends the trial court violated the spirit of <u>Batson v. Kentucky</u>, 476 U.S. 79 (106 S. Ct. 1712, 90 L. Ed. 2d 69) (1986), in denying his request to question the assistant district attorney and law enforcement officers about investigatory information upon which the State based its strikes.** The ultimate burden of persuasion regarding racial motivation of peremptory strikes rests with and never shifts from the opponent of the strike. <u>Purkett v. Elem</u>, 514 U.S. 765 (115 S. Ct. 1769, 1771, 131 L. Ed. 2d 834) (1995). Therefore, in order to prevail on his <u>Batson</u> challenge, Williams had the burden of proving that the State engaged in purposeful discrimination in the exercise of its peremptory strikes. **<u>Batson</u> does not require and Williams offers no authority to support his proposition that in order to bolster his prima facie case of discrimination Williams was entitled to formally interrogate the prosecutor or law enforcement officers as to their method of investigating potential jurors or information gleaned from such investigation in order to discover directly the information obtained by the State in preparing for its jury selection. We decline to so hold here.**

271 Ga. at 324, 519 S.E.2d at 233 (emphasis added). At the bottom line, there is nothing illegal, improper, or unreasonable about a prosecutor asking experienced law enforcement officers with considerable knowledge about members of the community for comments about potential jurors. Indeed, the State submits that such action shows good initiative and sound judgment, an argument that may be fully supported by a number of hypothetical situations. E.g., one of the detectives might know that "potential juror X" was involved in on-going criminal enterprise being covertly investigated by the detective and that "potential juror X" had not previously been convicted of a crime that would be disclosed by a traditional records check.

X. **DISTRICT ATTORNEY YATES HAS CORRECTLY EXPLAINED THAT THE ABSENCE OF A LARGE PERCENTAGE OF BLACK JURORS ON CASES IN RANDOLPH COUNTY WAS ATTRIBUTED TO THE FACT THAT THERE WAS ONLY ABOUT "FIVE PERCENT MINORITIES" IN THE COUNTY.**

17. **The relatively small number of black citizens in Randolph County is no state secret.**

20

a.      When asked at his deposition about trial counsel stating that he "had a history of

not accepting African-American jurors," District Attorney Yates replied as follows:

> The problem is -- is in Randolph County we have, like, five percent -- or
> **at the time we had five percent minorities**, and we don't get a whole lot of -- I
> mean, you know, we just don't get -- we may have 30 jurors out of -- out of 70,
> and we'll have one minority, and they may or may not get called.  **I mean, it's not
> -- it's not an intent not to select them**; it's just that we don't -- you know, we're --
> we're the size county, and that's the --  we get a lot of -- lot of Quaker jurors who
> don't believe in the death penalty, either.  So, I mean, it's just sort of a -- I don't
> know exactly why Randolph County is constituted the way it is.  It just is.

> [When counsel stated, "[t]he record -- the transcript reflects that you didn't
> respond to defense counsel's claim that you would strike minority jurors.  Do you
> recall why you would not have responded to that?" District Attorney Yates
> responded as follows.]

> A.   No.  I -- I'm not sure.  I don't -- all I remember is the judge said I didn't
> really have to give a reason, but I went ahead and gave reasons, so -- I mean, I -- it
> -- to me it wasn't ever a racial -- a  case that had any racial bias one way or the
> other, and it seemed like an odd thing to object on.  But, you know, the -- y'all
> represent your client.  You know, **we certainly had no intent not to select
> minority jurors.**

Yates Depo. T, p. 46 (emphasis added).

b.      District Attorney Yates' assertion that Randolph County had "five percent

minorities" is accurate.  Page 27 of the State's 19 April 2004 <u>Kandies</u> appellate brief filed in the

United States Court of Appeals for the Fourth Circuit states:

> According to the 2000 Census, Randolph County, North Carolina, has a
> total population of 130,454, which includes 7,342 citizens classified as Black or
> African American (i.e., **Randolph County's black population is approximately
> 5.1% of its total population**).  <u>See</u> Addendum 1 hereto.

(Emphasis added).   Please <u>see</u> Attachment 1 of Doc. 96 filed with the Court (a copy of the

census report).

XI. **FOR SOUND REASONS, THE COURT SHOULD DISREGARD THE 2 SEPTEMBER 2010 JOINT AFFIDAVIT OF TWO MICHIGAN STATE UNIVERSITY PROFESSORS, EXHIBIT I OF PETITIONER'S 8 SEPTEMBER 2010 BRIEF.**

18.     **The 2 September 2010 affidavit presents merely a part of an interim report submitted to support many Racial Justice Act ("RJA") motions filed in North Carolina state cases (see N.C.G.S. § 15A-2010, the RJA).**

a.      Appendix 1 hereto presents an extract of the motion filed by Petitioner in the 6 August 2010 "Motion for Appropriate Relief Pursuant to the Racial Justice Act." As Petitioner knows, this 46-page motion is approximately one inch thick and contains 19 exhibits that follow page 46. The first exhibit is the 30 July 2010 affidavit of Michigan State University law professors Catherine Grosso and Barbara O'Brien. The entire 6 August 2010 motion is not attached because there appears to be no sound reason to present the voluminous motion in these proceedings.

b.      Appendix 2 hereto accurately confirms that 152 North Carolina death row inmates have filed RJA motions in North Carolina state court and that the Conference of District Attorneys is making efforts to provide District Attorneys assistance in handling the many motions (e.g., assistance in gathering data, getting a statistical expert to analyze the study).

19.     **The 2 September 2010 affidavit presents incomplete information and opinions that have not been evaluated by state district attorneys.**

a.      The first sentence of paragraph 4 of the affidavit concedes that the affidavit of professors Grosso and O'Brien "presents [only] our initial findings with respect to the peremptory strike study with reference to Randolph County."

b.       The penultimate sentence of paragraph 4 of the affidavit concedes the significant fact that the two affiants/professors "have had time to perform only some of the relevant analyses."

c.       Appendix 2 hereto confirms that well-known fact that efforts are being taken to evaluate and respond to the interim report prepared by professors Grosso and O'Brien.

20.      **The State denies all factual and legal allegations in the 2 September 2010, except to the extent that they are uncontroverted (e.g., established in the record, or admitted elsewhere in matters before the Court).**  More precisely, the State denies that (a) Petitioner has been subject to or given a death sentence or will be executed pursuant to any judgment sought or obtained on the basis of race, in violation of the RJA, (b) death sentences were sought or imposed significantly more frequently upon persons of one race than upon persons of another race, (c) any use of a peremptory challenge was made on the basis of race, (d) sentences were sought or imposed significantly more frequently as punishment for capital offenses against persons of one race than as punishment of capital offenses against persons of another race, and, (e) any federal or state constitutional right has been violated by Petitioner receiving a sentence of death.

21.      **As Petitioner knows, the forum for litigation of his RJA claims is the Superior Court of Randolph County, not this federal court.** See N.C.G.S. §§15A-2010-2012. Under the RJA, Petitioner's opportunity to raise his post conviction claim must comply with procedures applicable for review of post conviction motions for appropriate relief as set out in N.C.G.S. §§ 15A-1420, 15A-1421, and 15A-1422.  See N.C.G.S. § 15A-2012(c).

22.      **In these habeas proceedings, Petitioner is now essentially relying on the RJA,**

which is a state statutory creation not mandated by the United States Constitution. <u>See</u>

<u>McCleskey v. Kemp</u>, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). Therefore, his

RJA claim does not present a cognizable federal habeas corpus claim in this Court. <u>Estelle v.</u>

<u>McGuire</u>, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480, 116 L. Ed. 2d 385, 396 (1991) ("It is not the

province of a federal habeas court to reexamine state-court determinations on state-law questions.

In conducting habeas review, a federal court is limited to deciding whether a conviction violated

the Constitution, laws, or treaties of the United States."); <u>Wright v. Angelone</u>, 151 F.3d 151, 157

(4th Cir. 1998) ("It is black letter law that a federal court may grant habeas relief only on the

ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the

United States.") (quotation marks omitted). Petitioner's argument rests solely upon North

Carolina statutory law, ergo, it is not cognizable on federal habeas review.

23.     **Petitioner failed to either develop or present in state court proceedings the**

**information he has submitted to this Court as Exhibit 1 of his 8 September 2010 brief.** <u>See</u>

<u>Rios-Lopez v. Wasden</u>, 2009 U.S. Dist. LEXIS 28181 (D. Idaho Mar. 30, 2009)(in which the

Court agrees with argument "that Petitioner is not entitled to discovery or an evidentiary hearing

because he did not show diligence in trying to develop these facts in the state court proceeding"),

stating the following law equally applicable to Petitioner's presentation of a recently drafted in-

complete report of two professors:

> If a petitioner wishes to bring new evidence on federal habeas review that
> has not been presented to the state courts, and he failed to develop the factual
> basis of the claims in state court because of "lack of diligence or some greater
> fault, attributable to" him or his counsel, then he must meet the requirements of
> [28 U.S.C.] § 2254(e)(2). <u>Williams v. Taylor</u>, 529 U.S. 420, 432, 120 S. Ct. 1479,
> 146 L. Ed. 2d 435 (2000). If he is not at fault for not presenting the evidence to
> the state courts, then he can present the evidence on federal habeas corpus review

24

without meeting the requirements of § 2254(e)(2). <u>Holland v. Jackson</u>, 542 U.S. 649, 652-53, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004).

The <u>Williams v. Taylor</u> Court explained what it means to fail to develop the facts in state court:

> The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts. The purpose of the fault component of "failed" is to ensure the prisoner undertakes his own diligent search for evidence. Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful.

529 U.S. at 436.

. . . .

As a result of his failure to exercise diligence during the state court proceedings, if Petitioner wishes to introduce new evidence in this action, he must meet the standard of § 2254(e)(2) and show that his claims are based either on a new retroactive rule of constitutional law or on a factual predicate that could not have been previously discovered through the exercise of due diligence, and that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilt of the underlying offense." <u>See</u> § 2254(e)(2)(A)&(B). This Petitioner has not done.

2009 U.S. Dist. LEXIS 28181 at *3-10. <u>Accord</u> <u>Fleming v. Glebe</u>, 2010 U.S. Dist. LEXIS 95216 (W.D. Wash. Aug. 9, 2010)(denying request for an evidentiary hearing in habeas proceeding because petitioner had not met requirements stated in 28 U.S.C. §2254(e)(2)).

## XII. THE COURT SHOULD DISREGARD OPINIONS EXPRESSED BY ATTORNEYS IN EXHIBITS ATTACHED TO PETITIONER'S BRIEF.

24. **The Order of 29 January 2009 (Doc. 105), at page 4, correctly assesses the**

**situation presented by the affidavits.** I.e., because Petitioner did "not desire to take the deposition of Petitioner's trial counsel," the Court correctly concluded "that any issue concerning the conclusory claim that the state trial prosecutor, Mr. Yates, had never selected a black juror has become moot and will not be further considered as a ground for relief."

25. **The Court should give no weight to legal conclusions and related observations stated by attorneys in Exhibits 9-12 attached to Petitioner's Brief of 8 September 2010.** In considering this argument, the Court is respectfully requested to follow the sage reasoning of Judge Thornburg in <u>Jackson v. United States</u>, 638 F. Supp. 2d 514 (W.D.N.C., 2009)(holding: the Court will <u>exclude</u> affidavits of attorneys), <u>certificate of appealability denied</u>, 2010 U.S. Dist. LEXIS 80944 (W.D.N.C., July 12, 2010), which includes the following reasoning equally applicable to the attorney affidavits attached to Petitioner's brief:

> Assuming the attorneys do qualify as experts, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). "**That said, an expert witness cannot give an opinion as to [his or] her legal conclusion; i.e., an opinion on an ultimate issue of law.**" <u>Nationwide Transp. Fin. v. Cass Info. Sys. Inc.</u>, 523 F.3d 1051, 1058 (9th Cir. 2008) (quoting <u>Hangarter v. Provident Life & Accident Ins. Co.</u>, 373 F.3d 998, 1016 (9th Cir. 2004)). "**[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible.**" <u>United States v. McIver</u>, 470 F.3d 550, 562 (4th Cir. 2006). That is precisely what each attorney has done in his or her affidavit by opining that trial counsel rendered ineffective assistance of counsel. **As a result, the undersigned will exclude these affidavits.** <u>See</u>, e.g., <u>Newland v. Hall</u>, 527 F.3d 1162, 1207 (11th Cir. 2008) (affidavits from trial counsel and other attorneys regarding what constitutes effective assistance in capital cases are not dispositive and have little weight); <u>United States v. Barile</u>, 286 F.3d 749, 760 (4th Cir. 2002) (**role of the district court is to distinguish opinion testimony that embraces the ultimate issue of fact from opinion that states a legal conclusion, that is, specialized legal meaning**); <u>United States v. Chapman</u>, 209 F. App'x 253 (4th Cir. 2006) (district court did not err in excluding expert testimony concerning securities law), cert. denied, 550 U.S. 949, 127 S. Ct. 2286, 167 L. Ed. 2d 1117 (2007); <u>McIver</u>, 470

26

F.3d at 562 (collecting cases); <u>DiBella v. Hopkins</u>, 403 F.3d 102, 121 (2d Cir. 2005) (testimony that defendant's conduct was extortion excluded); <u>Archuleta v. Lemaster</u>, 37 F. App'x 391, 393 (10th Cir. 2002) (expert testimony as to whether trial counsel provided ineffective assistance rejected as advising the court about the proper application of existing law to the facts and the ultimate issue of trial counsel's effectiveness); <u>United States v. Wilson</u>, 133 F.3d 251 (4th Cir. 1997) (district court should not have allowed expert opinion as to what the law means or how it is interpreted).

638 F. Supp. 2d at 527-28 (emphasis added).

**XIII. WHEN EVALUATING ALL MATTERS NOW BEFORE THE COURT, THE COURT SHOULD CONSIDER ALL CIRCUMSTANCES BEFORE THE COURT, THE LEGITIMATE CONCERNS OF THE STATE TO REACH A POINT OF FINALITY IN CRIMINAL PROSECUTIONS WITHOUT UNNECESSARY DELAY AND EXPENDITURE OF TIME, EFFORT, AND FUNDS.**

26.     **When evaluating this argument, please consider all previous arguments and authorities submitted to the Court supporting this position.**

a.     In particular, please note well that three officers of the Court (District Attorney Yates, Assistant District Attorney Gregson, and former District Attorney Toomes) have made unqualified assertions under oath (a) totally debunking Petitioner's <u>Batson</u> claims, and, (b) affirmatively asserting that in capital cases District Attorney Yates' one goal during jury <u>voir</u> <u>dire</u> has at all times been to obtain unbiased jurors who were not opposed to the death penalty.

b.     Finally, in 2010, when evaluating the judgment of (a) the honorable jurist who presided at Petitioner's 1994 trial, (b) the honorable district attorney who prosecuted Petitioner in 1994, and, (c) the honorable justices of the Supreme Court of North Carolina who unanimously rejected Petitioner's <u>Batson</u> claim in 1996, this Court is also respectfully requested to consider the following relatively recent comments of the Supreme Court of Pennsylvania in

Commonwealth v. Cook, 597 Pa. 572, 952 A.2d 594 (2008), that are equally applicable to the

case at bar:

> **[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal'** and will not be overturned unless clearly erroneous." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting Hernandez v. New York, 500 U.S. 352, 364, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (plurality)); accord Wilson v. Beard, 426 F.3d 653, 668 (3d Cir. 2005). Such great deference is necessary "because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations." Miller-El, 537 U.S. at 339. "There will seldom be much evidence bearing on" the "decisive question" of "whether counsel's race-neutral explanation for a peremptory challenge should be believed." Id. (quoting Hernandez, 500 U.S. at 365). **"[T]he best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province."** Id. (quoting Hernandez, 500 U.S. at 365) (internal quotation marks omitted); accord Batson, 476 U.S. at 98 n.21; Commonwealth v. Sneed, 587 Pa. 318, 899 A.2d 1067, 1076 (Pa. 2006) (noting that "Batson contemplated a central role for the trial judge . . . in assessing the credibility of the neutral reasons for peremptory strikes proffered by the lawyer who exercised them"); Commonwealth v. (Aaron) Jones, 542 Pa. 464, 668 A.2d 491, 520 (Pa. 1995); Riley v. Taylor, 277 F.3d 261, 278 (3d Cir. 2001) (noting that a trial judge's findings as to discriminatory intent are generally owed "even greater deference because only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said") (internal quotation marks omitted); United States v. Casper, 956 F.2d 416, 419 (3d Cir. 1992).
>
> **The clear error standard of review is all the more appropriate on collateral review when the Commonwealth faces an even heavier burden of production given that many years have passed since voir dire was conducted. As the Third Circuit has explained, "in light of the passage of time . . . it [i]s appropriate to lessen the burden of the Commonwealth"** to explain its peremptory challenges in race-neutral terms. Wilson v. Beard, 426 F.3d 653, 668 (3d Cir. 2005) (where twenty years had elapsed since trial).

597 Pa. at 587, 952 A.2d at 603 (emphasis added). See also Smulls v. Roper, 535 F.3d 853 (8th

Cir. 2008), cert. denied, 129 S. Ct. 1905, 173 L. Ed. 2d 1061 (2009), stating, inter alia:

Smulls first argues that the Missouri trial court made no findings concerning the validity of the prosecutor's claimed race-neutral reasons for the strike, and therefore the court unreasonably applied federal law.  **Smulls fails to direct us to any Supreme Court case holding that the Constitution requires a trial court to make specific fact-findings in reviewing a <u>Batson</u> challenge.**  <u>See</u> <u>Carey v. Musladin</u>, 549 U.S. 70, 127 S. Ct. 649, 653, 166 L. Ed. 2d 482 (2006) ("'[C]learly established Federal law' in § 2254(d)(1) 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).  In fact, federal law has never required explicit fact-findings following a <u>Batson</u> challenge, especially where a prima facie case is acknowledged and the prosecution presents specific nondiscriminatory reasons on the record.  <u>See</u> <u>Miller-El I</u>, 537 U.S. at 347 ("We adhere to the proposition that a state court need not make detailed findings addressing all the evidence before it."); <u>see</u> <u>also</u> <u>McKinney v. Artuz</u>, 326 F.3d 87, 100 (2d Cir. 2003) ("Although reviewing courts might have preferred the trial court to provide express reasons for each credibility determination, no clearly established federal  law required the trial court to do so.").   A trial court's ruling on a <u>Batson</u> challenge is itself a factual determination, and we have repeatedly upheld rulings made without additional reasoning.  <u>See</u> <u>U.S. Xpress Enters., Inc. v. J.B. Hunt Transp., Inc.</u>, 320 F.3d 809, 814 (8th Cir. 2003) (concluding that the trial court engaged in "a full <u>Batson</u> analysis" where the objector made a <u>Batson</u> challenge, the proponent of the strike offered a race-neutral explanation, both parties were allowed to argue their positions, and the trial court granted the motion without making any specific findings, implicitly finding the proponent's reasons to be racially motivated); <u>see also</u> <u>Wainwright v. Witt</u>, 469 U.S. 412, 430, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985) (upholding a state trial court's dismissal of a juror for cause and noting "that the judge was [not] required to announce for the record his conclusion that [the] juror . . . was biased, or his reasoning" because the finding was evident from the record).

     **We do not read the Supreme Court's most recent case addressing <u>Batson</u> to hold otherwise.**  <u>See</u> <u>Snyder v. Louisiana</u>, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008).  In <u>Snyder</u>, the Court refused to presume that the trial court credited the prosecutor's representation that he struck the challenged juror based on the juror's demeanor because the trial court had made no determination concerning the juror's demeanor.  <u>Id</u>. at 1209.  But, a number of factors led the Court to that conclusion.  First, the trial court in <u>Snyder</u> did not state whether it based its ruling on the first proffered reason (claimed nervousness on the part of the juror), the second reason (other pressing time constraints--student teaching responsibilities), or on both, and the Court was unwilling to assume the trial court relied on the first reason when the Court found that the second reason did not stand up to scrutiny under the deferential standard.  <u>Id.</u> at 1209, 1212.  Notably,

29

the Court applied the deferential standard to the second proffered reason, which it found lacking, even though the trial court made no findings concerning the second reason other than allowing the strike. Id. at 1209. Second, the Court rejected the second reason offered by the prosecutor, leaving the juror's alleged nervousness as the only potentially valid basis for the strike, and there was no evidence in the record that the prosecutor would have pre-emptively challenged the juror based on his nervousness alone. Id. at 1212. Third, the Court rejected the second reason for the strike because it was "highly speculative" and because the same reasoning would have applied with more force to specific white jurors, whom the prosecutor did not strike. Id. at 1211-12. **Despite the reversal of the trial court in Snyder, the Court continues to "recognize[] that . . . determinations of credibility and demeanor lie peculiarly within a trial judge's province," and, "in the absence of exceptional circumstances, [the Court will] defer to the trial court."** Id. at 1208 (internal marks omitted). In our case, both proffered reasons withstand scrutiny, as discussed in more detail infra, such that we are not left to surmise whether one of the two reasons alone would support the strike as nondiscriminatory. There is no evidence here that the prosecutor's proffered reasons applied with greater force to white jurors who were not struck; in fact, the prosecutor used the same reasons--occupation and demeanor--to strike a white juror. **In any event, Snyder was not clearly established law at the time of the state courts' rejection of Smulls' Batson claim and cannot provide the basis for habeas relief under § 2254(d)(1).** See Williams, 529 U.S. at 412.

In a related context involving the dismissal of jurors for cause who are "substantially impaired" in their ability to impose the death penalty, the Supreme Court recently explained that "there is no requirement in a case involving the Witherspoon-Witt rule that a state appellate court make particular reference to the excusal of each juror. It is the trial court's ruling that counts." Uttecht, 127 S. Ct. at 2228 (internal citations omitted). Here, **by denying the Batson challenge, the trial court implicitly found that the prosecution's proffered nondiscriminatory reasons were credible. No further fact-finding was required.** The absence of additional findings is certainly not a misapplication of clearly established Supreme Court precedent as required for relief under § 2254(d)(1).

**Nor does the trial court's failure to make explicit findings relieve this court of its obligation to view the state trial court's findings as presumptively correct** [footnote 3: **Snyder, which was a direct appeal from the Supreme Court of Louisiana, does not change the respect owed to state court findings as mandated by AEDPA.** On review of a direct appeal, the Supreme Court is not bound by the presumption of correctness required by § 2254(e)(1).] **or empower us to order the federal district court to reconstruct the record.** [footnote 4: As recently noted by the Supreme Court, such a remand, more than a decade later,

would be futile.  See Snyder, 128 S. Ct. at 1212 ("Nor is there any realistic possibility that this subtle question of causation could be profitably explored further on remand at this late date, more than a decade after petitioner's trial."). ] Prior to AEDPA, the presumption of correctness was contained in § 2254(d), which listed eight exceptions to the presumption.  See 28 U.S.C. § 2254(d) (1994), amended by Antiterrorism & Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 104(4), 110 Stat. 1214, 1219 (1996).  AEDPA's amendments to § 2254 "jettisoned . . . [the] situations which previously swept aside the presumption."  Valdez v. Cockrell, 274 F.3d 941, 949 (5th Cir. 2001), cert. denied, 537 U.S. 883, 123 S. Ct. 106, 154 L. Ed. 2d 141 (2002).  **The presumption of correctness erected in its place at § 2254(e)(1), now simply provides that unless the petitioner can rebut the findings of fact through clear and convincing evidence, those findings of fact are presumed to be correct.**"  Id.; see also Miller-El I, 537 U.S. at 358-59 (Thomas, J., dissenting) ("Section 2254(e)(1) does not, as its predecessor did, create exceptions to factual deference for procedural infirmities. . . . Section 2254(e)(1) simply cannot be read to contain an implied sliding scale of deference.") (noting that the majority opinion does not appear to conflict with this view).  Thus, regardless of the extent of the evidence considered by the state trial court, we may reject the trial court's factual findings only if those findings are proven incorrect "by clear and convincing evidence."  § 2254(e)(1); see also Hall v. Luebbers, 341 F.3d 706, 713 (8th Cir. 2003) ("Each step of the Batson inquiry involves a factual determination entitled to a presumption of correctness unless overcome by clear and convincing evidence."), cert. denied, 541 U.S. 996, 124 S. Ct. 2031, 158 L. Ed. 2d 505 (2004).  Our suggestions to federal trial judges that they are well advised to articulate their findings concerning the validity of the prosecutor's asserted race-neutral reasons, see, e.g., Hopson v. Fredericksen, 961 F.2d 1374, 1378 (8th Cir. 1992) ("We strongly suggest . . . that trial judges [addressing a Batson challenge] make an on-the-record ruling stating their reasoning with appropriate references to the underlying facts as they determine them to be."), are, of course, not binding on state court judges.  We therefore will presume the trial court's fact-findings to be correct unless Smulls can present "clear and convincing evidence" otherwise. § 2254(e)(1).

535 F.3d at 859-62 (emphasis added).

       c.      Importantly, please see Doc. 15, p. 8 (distinguishing Snyder), hereby incorporated by reference.

## CONCLUSION

27. **Petitioner has not carried his heavy burden and matters of record show that his Batson claim was not unreasonably rejected by the Supreme Court of North Carolina.**

Accordingly, upon reconsideration, the Court should again reject Petitioner's <u>Batson</u> claim.

VERY RESPECTFULLY submitted this 28th day of September 2010.

ROY COOPER
Attorney General

/s/ Edwin W. Welch
Edwin W. Welch
Special Deputy Attorney General
Counsel for Respondent
N.C. Bar # 5208

North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Phone: 919-716-6577
FAX: 919-716-0001
ewelch@ncdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on 28 September 2010, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which will send notification of such filing to the

following:

> Mr. M. Gordon Widenhouse, Jr.
> mgwidenhouse@rwf-law.com
>
> Ms. Shelagh R. Kenney
> shelagh@cdpl.org
>
> attorneys for Petitioner.

ROY COOPER
Attorney General

/s/ Edwin W. Welch
Edwin W. Welch
Special Deputy Attorney General

cc:    District Attorney Garland N. Yates, 19-B Prosecutorial District
       Randolph County Office

33