# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
# DURHAM DIVISION
# 1:99CV00764

| | |
|---|---|
| JEFFREY CLAYTON KANDIES | PETITIONER'S REPLY BRIEF ON REMAND FROM SUPREME COURT OF THE UNITED STATES |
| GERALD BRANKER | |

In its brief, respondent almost wholly misses the mark. The remand of this case in light of *Miller El v. Dretke* (*Miller-El II*) indicated the decision might apply to this case. Indeed, it does. While *Miller-El II* does not alter the ultimate three-part test in *Batson v. Kentucky* (and petitioner has never suggested that it did), it demonstrates that statistical disparities in peremptory strikes matter, that a prosecutor's past practices with peremptory strikes matter, that disparate treatments of similarly situated jurors of different races matter, and that accurate explanations for peremptory strikes matter. Jeffrey Kandies has presented compelling and essentially uncontradicted evidence of each, which demonstrates the state court's adjudication of this federal issue was unreasonable. Thus, he has shown that, in light of *Miller-El II*, his petition for a writ of habeas corpus should be granted.

Respondent fails to address the significant statistical disparity in Garland Yates' use of peremptory strikes against black prospective jurors and white prospective jurors. The statistical evidence in this case is strong, and respondent has not, and indeed cannot, challenge it. As set forth in petitioner's brief, Yates struck nine of the twelve eligible black prospective jurors. He struck only six of the thirty-four eligible white venire members. (Ex. 1, Table 1; Ex. 14, Chart of Venire Members) Thus, he used peremptory strikes to exclude 75% of the eligible black venire members, more than four times the rate (18%) at which he struck all other venire members, including whites and other non-black racial minorities. This statistical evidence is "remarkable" and weighs heavily in favor of finding that "[h]appenstance is unlikely to produce this disparity." *Miller-El II*, 545 U.S. at 241.

Respondent weakly attempts to dismiss the strength of this evidence by claiming Mr. Kandies cannot show the identical evidentiary support for his claim as Miller-El presented, so his claim must fail. (Respondent's Brief at 4-10) First, *Miller-El II* in no way establishes that certain "unacceptable practices" must be present in order to prevail on a *Batson* claim. It merely addressed the facts before it in the context of a *Batson* analysis. Second, respondent's attempt to distinguish this case from *Miller-El II* falls short. Respondent wrongly insinuates Mr. Kandies offered no evidence that Yates engaged in disparate questioning depending on the race of the prospective juror. (Respondent's Brief at 4-5) On the

1

contrary, Mr. Kandies offered extensive, compelling evidence that Yates used different scripts in questioning prospective jurors depending on the juror's race in an effort to dismiss black prospective jurors for cause. (Petitioner's Brief at 15-17) Respondent seems to claim Miller-El put forth evidence of a prosecutorial policy of excluding blacks from juries, but Kandies did not. (Respondent's Brief at 5) Significantly, respondent notes that, in *Miller-El II,* a Dallas County district judge and former assistant district attorney offered evidence that he believed the office had a systematic policy of excluding blacks from jury service. (Respondent's Brief at 5-6, quoting *Miller-El II*, 545 U.S. at 263-64) Respondent's argument is incorrect. Kandies has offered significant and compelling evidence that there was a consistent practice of excluding blacks from jury service. (Petitioner's Brief at 17-20) Respondent conveniently ignores Mr. Kandies' compelling evidence presented through affidavits of numerous criminal defense attorneys, including Richard Roose, one of Yates' former assistants, who have practiced in the same jurisdiction for many years.

The point in *Miller-El II* is not that an explicit, written policy must exist, although such a policy is some evidence of discrimination in jury selection. Rather, the point in *Miller-El II* is that evidence showing a systemic practice of discrimination in a particular prosecutorial office shows discrimination under *Batson*. A small, rural prosecutorial office like Randolph County might not have written policies for jury selection. But a "policy" can be gleaned from the actions of the prosecutors, particularly here, where the district attorney himself prosecuted all of the capital cases in question and assumed primary responsibility for the jury selection, as he did in this case. The most poignant proof of Yates' policy is his actions in capital cases over the years. His actions speak volumes.

Respondent argues that Yates' reliance on prospective juror Angelia Randleman's criminal record was a "perfectly appropriate race-neutral reason for exercising a peremptory challenge." (Respondent's Brief at 11) Again, respondent misses the point. The critical question is whether this explanation was pretextual. There is no question Mr. Kandies' similarly-situated analysis must be given weight. It shows the state court's rejection of this analysis was unreasonable where, on direct appeal, the state court held, "Defendant's approach 'involves finding a single factor among the several articulated by the prosecutor ...

2

and matching it to a passed juror who exhibited that same factor.' We have rejected this approach and do so again because it 'fails to address the factors as a totality which when considered together provide an image of a juror considered ... undesirable by the State.'" *Kandies*, 342 N.C. at 435-36 (internal citations omitted). Respondent ignores the analysis in *Miller-El II* that the reasonableness of the justification given for a peremptory challenge must be evaluated in light of the totality of the surrounding circumstances. The pretextual nature of Yates' peremptory strike against Randleman is evident both by his failure to question her about her criminal history and his passing at least eight white venire members with prior convictions undisclosed on their questionnaires or during questioning. (Petitioner's Brief at 7-8, 12-15) Indeed, Respondent completely fails to address the extensive evidence of Yates repeatedly accepting white prospective jurors who were similarly-situated to the black prospective jurors whom he struck. *See Miller-El II*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination ….").

Other than its argument regarding the use of a peremptory challenge against Randleman, respondent makes no mention of the vast evidence showing Yates treated similarly-situated white prospective jurors far more favorably than black prospective jurors. (Petitioner's Brief at 4-15) In addition to the disparate treatment of these similarly-situated prospective jurors, Mr. Kandies also showed Yates used a peremptory challenge against black prospective juror Normesa Oliver even though the reason given applied equally to white prospective jurors. Specifically, Yates excused Oliver because she watched television in the jury waiting room in violation of the trial court's instructions. (Tpp. 962-65) Yates passed numerous white prospective jurors who heard about the case on the television or read about it in the newspaper. Charles Turner, who followed Oliver in the jury selection process, admitted he read about the case in the newspaper. (Tp. 973) Pamela Martin heard about the case on the television. (Tpp. 441-42) Jo Ann Summey heard about the case on the television and read about the case in the jury room after the trial court told her not to do so. (Tp. 456) Finally, although Mike Antonowicz said he read about the case in the newspaper after being summoned to court, Yates did not even question him

3

regarding this issue. (Tp. 988) Maxine Shina initially told Yates that she had not heard anything about the case (Tp. 45), but then she later revealed that she had seen the case on the television. (Tp. 90) Yates passed each of these white prospective jurors. Clearly, given his disparate treatment of similarly-situated jurors, Yates' reason for excusing Oliver was a pretext for race.

Respondent devotes almost two pages attempting to justify the state's failure to turn over the criminal record checks of prospective jurors at trial. (Respondents Brief at 12-13) This point is a red herring. In a footnote, Mr. Kandies noted the state did not turn over the criminal records at trial in an effort to demonstrate the unexplained discrepancy between what criminal record searches now show and what Yates incorrectly asserted at trial regarding the criminal records of prospective juror Fred Campbell and Henry Wilson. (Petitioner's Brief at 12, n.16) Respondent's argument concerning the trial court's rulings denying Mr. Kandies' motions to disclose is irrelevant. Respondent fails to address the fundamental issue that Yates struck black prospective jurors purportedly based on a claim that Campbell and Wilson had criminal records.

An important aspect of Mr. Kandies' showing was two findings by state trial courts that Yates violated *Batson*. (Petitioner's Brief at 18-19) Respondent tried to challenge the ruling in *State v. Trull*. (Respondent's Brief at 14-16) In *Trull*, the trial court found Yates had used race in exercising a peremptory challenge against Rodney Foxx, whom the trial court then ordered seated. The trial court rulings in both *State v. Trull* and *State v. Johnston* are not debatable in this litigation.[1] In both cases, the trial court found Yates had used race as a factor in exercising peremptory challenges. These findings augment Mr. Kandies' showing that Yates has used race as a factor and certainly challenge the self-serving avowals of Yates' chief Assistant District Attorney Andrew Gregson and Elizabeth Toomes, Yates' co-counsel in this case, that they never saw or heard Yates "manifest an intent to excuse any potential jurors based on their race." (Respondent's Brief at 8) Again, the point is not whether Yates

---

[1] Respondent does not dispute the trial court's finding that race was used as a factor by Yates in his use of peremptory strikes in *State v. Johnston*.

ever expressed, orally or in writing, a desire to exclude blacks. The point is the historical record shows he did. Yates' actions speak loudly for him.

Respondent also makes completely irrelevant arguments concerning the state's inability to turn over every document used in jury selection at Mr. Kandies' 1992 trial and Yates' inability to recall some information from the trial. These arguments have no bearing on the *Batson* claim, as Mr. Kandies in no way seeks relief because of the failure to preserve the file. Rather, he seeks relief based on extensive evidence of Yates' discriminatory practices in jury selection that stands essentially uncontested and warrants relief. Respondent cannot hide behind Yates' assertions in response to *some* questions at his deposition that he could not recall information. Yates has no difficulty remembering critical information regarding his interactions with Gregson and members of the High Point Police Department before jury selection in this case. (Petitioner's Brief at 9-11) He clearly and unequivocally told the trial court he had spoken with members of the High Point Police Department who told him prospective jurors Rawlinson and McClure would be weak on the death penalty. (Kandies Trial Tr. 160-161) Because Rawlinson and McClure were not "weak on the death penalty" in their responses to Yates' *voir dire* questioning (Tpp. 131 (Rawlinson) and Tp. 153 (McClure)),[2] Yates retreated to a justification for his strikes of these two blacks by misstating contact he had with and inaccurately recounting information he received from these

---

[2]Rawlinson and McClure indicated no hesitancy about the imposition of the death penalty. Yates questioned Rawlinson as follows:
  Yates: Do you have any strong feelings or beliefs concerning the death penalty?
  Rawlinson: No.
  Yates: Have you thought about it at any time in the past?
  Rawlinson: No, I haven't.
  Yates: And do you have any feeling whatsoever about it? Could you consider it as well as life imprisonment as a possible punishment?
  Rawlinson: I – Yes. (Tp. 137)
McClure's answers to Yates' questions about the death penalty are showed that he was not "weak" on the death penalty:
  Yates: Do you have any feelings period about the death penalty?
  McClure: Well –
  Yates: Have you ever thought about it?
  McClure: Yes.
  Yates: What – The State and the Defendant want someone who can consider both possible punishments, would not automatically vote one way or the other.
  McClure: Well, some cases deserve it and some don't.
  Yates: There are some cases you believe it's an appropriate punishment and others you don't?
  McClure: Yes. (Tp. 153)

5

law enforcement officers.  In his deposition, Yates, *without hesitation or reference to the passage of time or to his 2006 car accident*, testified he never spoke to any members of the High Point Police Department concerning any prospective jurors in this case.  He said he asked Gregson, a newly-hired assistant district attorney, to pass around the jury list to see if any police officers knew any of the prospective jurors and whether any of the prospective jurors had a criminal record. (Deposition of Garland Yates at 13, 15, 16, 24-27)  Yates did not seek information regarding prospective jurors' views on the death penalty. (Deposition of Garland Yates at 26-27)  Yates could not have been clearer: he did not get any information from members of the High Point Police Department regarding prospective jurors' death penalty views.[3] So his statement to the trial court was false.

In another irrelevant point, respondent suggests there was a legitimate reason for Gregson to contact the High Point Police Department.  (Respondent's Brief at 17-20)  Mr. Kandies has never claimed there was some violation of his constitutional rights by Gregson contacting members of the High Point Police Department at Yates' request.  Rather, Mr. Kandies takes issue with, and calls into question, the veracity of all of Yates' supposedly race-neutral reasons for striking black prospective jurors.  Mr. Kandies' point is that, during jury selection, Yates intentionally misstated the information he received from the High Point Police Department.  This false information led the trial court to find no *Batson* violation for the striking of black prospective jurors Rawlinson and McClure.  The state court's acceptance of these reasons, which are not supported by the record, is unreasonable.

Indeed, as Mr. Kandies shows through extensive, uncontradicted evidence, Yates' rate of striking black prospective jurors far exceeds his rate of striking white prospective jurors.  In the 1990s, Yates was three times more likely to strike black prospective jurors than white prospective jurors.  While respondent tries to cloud the issue by referencing the small percentage of blacks in Randolph County (Respondent's

---

[3]Gregson's deposition reinforces that Yates never asked members of the High Point Police Department about their knowledge of prospective jurors' death penalty views. As Gregson testified he, and not Yates, had contact with officers with the High Point Police Department and the information that he expected officers to have concerned whether any prospective jurors had prior involvements with the police department. (Gregson Deposition at 15-16) Gregson never reviewed any of the notes that police officers made on the jury pool list. (Gregson Deposition at 17)

6

Brief at 20-21), he completely ignores that when Yates selected this jury from Guilford County, with a jury pool having a much higher percentage of blacks, his rate of striking black prospective jurors was no different. Indeed, his strike rate was even higher in Mr. Kandies' case. He was four times as likely to strike black prospective jurors as he was to strike white prospective jurors. (Ex. 1, Table 1; Ex. 14, Chart of Venire Members)

Respondent's argument that Mr. Kandies is trying to litigate a claim under the Racial Justice Act (RJA) in this Court is absurd. Mr. Kandies, along with all individuals who were under a sentence of death as of 9 August 2009, was required to file a claim in state court on or before 10 August 2010. Mr. Kandies did so. Respondent seems to argue the affidavit, which Mr. Kanies obtained during the RJA litigation setting forth the statistical support for Yates' pattern of not selecting blacks for jury service in capital cases, should not be considered. (Respondent's Brief at 24) Contrary to the respondent's argument, this affidavit is properly before this Court and should be considered because it merely amplifies the facts Mr. Kandies developed in state court.

Respondent also seems confused by the affidavits from a number of criminal defense attorneys who have practiced with Yates, including a former assistant district attorney who served under Yates. First, respondent suggests these affidavits are inadmissible because they contain legal conclusions. On the contrary, these attorney affidavits provide factual observations and not legal conclusions. Second, respondent's reliance on Judge Thornburg's ruling excluding attorney expert affidavits in support of ineffective assistance of counsel claims is misplaced. There is a difference between an attorney's factual observations as opposed to legal conclusions.

Finally, respondent relies on Judge Eliason's statement in his 29 January 2009 Order that, because Mr. Kandies did not depose Clark Bell during the post-remand discovery phase, any issue concerning Yates' history of not seating black jurors was moot. (Respondent's Brief at 25-26) This position is meritless. First, Yates never disputed Bell's observation at Mr. Kandies' trial or in the federal post-conviction proceedings. Second, the issue is in no way mooted by Mr. Kandies' decision to forego deposing Bell. Instead, Mr. Kandies obtained an affidavit from Bell and thereby secured the necessary

7

information concerning his knowledge of Yates' pattern of not selecting blacks as jurors in capital cases. Mr. Kandies had the necessary information from his witness to support the claim without taking a deposition. Of course, respondent could have deposed Bell as part of the discovery process if it wanted to challenge Bell's averments to the trial court. Respondent chose not to do so and should not benefit from this inaction. Indeed, it is respondent who has waived any challenge to Bell's statement.

Jeffrey Kandies has made a compelling and essentially uncontradicted showing of a *Batson* violation, both in this case and in the historical practices of the prosecutor. The state court unreasonably rejected this claim. In light of *Miller-El II*, habeas relief is in order.

## **Conclusion**

For the reasons stated herein, as well as in his original brief, Mr. Kandies is entitled to a writ of habeas corpus.

Respectfully submitted, this the 12th day of October, 2010.

/s/ M. Gordon Widenhouse, Jr.
M. Gordon Widenhouse, Jr.
N.C. Bar #10107
312 West Franklin Street
Chapel Hill, North Carolina 27516
Telephone: (919) 967-4900
Telefax:     (919) 967-4953

/s/ Shelagh Rebecca Kenney
Shelagh Rebecca Kenney
N.C. Bar #28202
Center For Death Penalty Litigation
201 West Main Street, Suite 301
Durham, North Carolina 27701
Telephone:  (919) 956-9545
Telefax:     (919) 956-9547

9

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Edwin W. Welch, Special Deputy Attorney General, State of North Carolina.

Respectfully Submitted,

/s/ Shelagh Rebecca Kenney
Shelagh Rebecca Kenney

10

Case 1:99-cv-00764-WO-JLW   Document 119   Filed 10/12/10   Page 11 of 11