**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

JEFFREY CLAYTON KANDIES,      )
                              )
            Petitioner,       )
                              )
      v.                      )      **MEMORANDUM OPINION**
                              )      **AND RECOMMENDATION**
GERALD BRANKER, Warden,       )
Central Prison,               )            1:99CV764
Raleigh, North Carolina,      )
                              )
            Respondent.       )

        This matter is before the court upon remand from the Fourth Circuit Court of

Appeals for further consideration in light of *Miller-El v. Dretke*, 545 U.S. 231 (2005).

The issue before the Supreme Court in *Miller-El* was whether the defendant had

proven that the prosecution had engaged in purposeful discrimination when it

exercised peremptory strikes against African-American jurors.  This court interprets

the remand as a request to reconsider only Petitioner's jury selection claims.

        The original petition for writ of habeas corpus was brought under 28 U.S.C.

§ 2254 by Jeffrey Clayton Kandies ("Petitioner"), who was found guilty of the

first-degree murder and first-degree rape of Natalie Lynn Osborne, the four-year-old

daughter of Petitioner's then-fiancée, Patricia Craven.  Following a jury

recommendation, the trial court sentenced Petitioner to death on the murder charge

and to life imprisonment on the rape charge.  Petitioner asserts in his habeas corpus

petition that the prosecution at his trial used peremptory strikes to improperly remove

African-American jurors based on their race, and therefore he is entitled to a writ of habeas corpus. As all of Petitioner's claims fail to meet the high statutory burden of proof, his petition for a writ of habeas corpus should be denied.

**Factual Background**

The facts underlying Petitioner's conviction, as summarized by the North Carolina Supreme Court on direct appeal, are as follows:

> Patricia Craven lived in Asheboro with her four-year-old daughter, Natalie, and her sons, Zachary and Jeremy, ages six and one, respectively. Defendant was Craven's fiancé and Jeremy's father. Although defendant had a separate residence approximately ten miles away in Randleman, he often stayed with Craven at her apartment in Asheboro.
>
> On Easter Monday, 20 April 1992, defendant and Craven disciplined Natalie for eating Zachary's Easter candy by requiring her to stay in her room for the remainder of the day. Craven saw Natalie periodically throughout the day, but last saw her alive between 4:00 and 4:30 p.m. Around 4:45 p.m., defendant left the apartment to go to the grocery store. He did not return until 7:30 that evening. He attributed his tardiness to helping an elderly couple who had mechanical problems with their Winnebago. Once home, defendant began fixing a pizza for the children. When it was ready, he told Zachary to call for Natalie. When Zachary did not find Natalie in her bedroom, defendant and Craven began looking for her. One neighbor told Craven that he had noticed Natalie outside playing sometime that afternoon, but no one recalled seeing her since that time. After a while, defendant called the Asheboro Police Department to report Natalie missing. An extensive search for her was conducted that night, but without success.
>
> Earlier that evening, around 7:00 p.m., defendant entered the Tank and Tummy, a small convenience store located about one-half mile from the Craven residence. Carolyn Wood, the clerk, testified that at that time, defendant was complaining about his hand hurting. He told Wood that he had gotten into a fight with his brother. Wood noticed that the hand was beginning to swell and suggested that defendant let a medical

technician who happened to be in the store look at his hand to see if it was broken. Defendant declined and immediately left the store.

Later that evening, close to midnight, defendant returned to the store to ask if Wood had seen Natalie. He showed Wood a picture of Natalie and told her to call the police if she saw the little girl. At the time, Wood observed black garbage bags in the back of defendant's truck.

On Tuesday, 21 April 1992, defendant agreed to accompany officers to his residence in Randleman to look for Natalie. The police surmised that perhaps Craven and defendant had hidden Natalie at the Randleman residence because Craven had been in a custody dispute over Natalie with her former husband, Ed Osborne. The police looked through the house but did not find Natalie.

On Wednesday, 22 April, Craven and defendant went to the Asheboro Police Department for questioning. Craven was questioned and released around 7:30 p.m., while defendant remained at the station for further interrogation. Defendant was finally taken home by Sergeant Rickey Wilson about 1:00 a.m. Upon defendant's return to the apartment, Craven asked him if he knew anything about what happened to Natalie. Defendant responded by telling Craven that he had hit Natalie with his truck when he was leaving to go to the grocery store on Easter Monday. Natalie was outside rather than in her room, and defendant did not see her in time to stop. Defendant said he panicked because he had been drinking. He picked Natalie up and took her to the house in Randleman to clean her off and see how badly she was hurt. During the drive to Randleman, defendant said that Natalie was making gurgling noises and that her head did not look right. After trying to clean her up, defendant concealed Natalie and her clothes in a garbage bag and put the bag in a bedroom closet. Defendant then got in his truck and took his time returning to Asheboro.

Craven called the police immediately upon hearing defendant's story. Defendant was taken to the Asheboro Police Department, where Sergeant Wilson read him his Miranda rights and then interviewed him. Defendant told Sergeant Wilson what he had told Craven. Shortly after giving a statement to Sergeant Wilson, defendant gave a statement to Lieutenant Lanny McIver. This statement was more detailed but in substance was the same as that given to Sergeant Wilson. Defendant

gave details as to the location of Natalie's body and signed consent to search forms for the Randleman house.

The police searched the Randleman residence and found Natalie's body in a plastic bag, buried under a pile of clothes and carpet pieces in a bedroom closet. A bloody playsuit and a bloody pair of panties, both turned inside out, were also found in the bag. The process of recovering the body was videotaped, and photographs of the crime scene were taken.

Dr. Thomas Clark, a forensic pathologist, performed an autopsy on the body shortly after it was recovered. He found two lacerations to the top of the head which he characterized as blunt-force injuries. He also found lacerations on the right side of the head and abrasions on the left side of the head and on the front of the neck; there was evidence the skull had been fractured. There were multiple bruises on the back and both sides; the bruises were small and rounded and had a distribution and shape suggestive of an adult hand. Clark also found injuries to the pelvic region. There were bruises on both sides of the vagina, which was full of blood. The opening of the vagina was patulous, and there was a laceration a half-inch wide and an inch long on the back wall of the vagina. Clark opined that these injuries were indicative of sexual assault and that they had occurred at or about the time of death.

That evening, after the results of the autopsy had been revealed, Lieutenant McIver again interrogated defendant. When McIver mentioned the possibility of sexual assault, defendant stated, "I told Pat you were going to say I did something like that to Natalie." Thereafter, in his statement, defendant denied doing anything sexual to Natalie. He remembered taking Natalie to his house, putting her in the bathtub, and taking off her clothes to see how badly she was hurt. At that time Natalie was bleeding extensively but appeared to be alive and moving. Defendant stated that he could not handle the situation and may have strangled Natalie.

A rape suspect collection kit test was completed on defendant. The kit included samples of head and pubic hair, saliva, and blood, and was submitted to the SBI crime lab for examination. Agent Lucy Milks, an SBI forensic serologist, performed a luminal and blood test on the Randleman residence and on defendant's truck. At the Randleman residence, she found the presence of blood on the bathroom floor and

tub; the bedroom floor; the laundry room floor; the kitchen floor; and the floor between the bedroom, bathroom, and den. She also found a small amount of blood on the interior of the passenger door of defendant's truck.

Defendant presented no evidence during the guilt-innocence phase. During the sentencing phase, defendant presented evidence through Dr. Brian Glover, a clinical psychologist, who testified as an expert in substance abuse treatment. Glover testified that by age seventeen, defendant was using alcohol and marijuana on a daily basis and that for the several years preceding this offense, defendant was drinking between twelve and twenty-four beers per day. It was Glover's opinion that defendant had severe alcohol dependence and that on the day of the offense, defendant was suffering from acute intoxication which affected his judgment and ability to control his emotions. Glover also opined that on 20 April 1992, defendant was under a mental disorder and that his ability to appreciate the criminality of his actions was impaired.

The jury found defendant guilty of first-degree murder based on both the felony murder rule and on premeditation and deliberation. It also found him guilty of first-degree rape. At the capital sentencing proceeding, the jury found as aggravating circumstances that the murder was committed while defendant was engaged in the commission of first-degree rape and that the murder was especially heinous, atrocious, or cruel. The jury found three of the five proposed statutory mitigating circumstances and eighteen of the twenty-eight nonstatutory mitigating circumstances submitted. It unanimously recommended a sentence of death, which the trial court accordingly imposed.

*State v. Kandies*, 342 N.C. 419, 430-433, 467 S.E.2d 67, 72-74 (1996).

**Procedural History**

Petitioner was sentenced to death at the April 4, 1994, Criminal Session of

Superior Court, Randolph County, following a jury verdict finding him guilty of

first-degree murder and first-degree rape. The conviction was affirmed by the North

Carolina Supreme Court. *State v. Kandies*, 342 N.C. 419, 467 S.E.2d 67 (1996).

Petitioner then filed a motion for appropriate relief ("MAR") in state court in

September 1997 claiming that (1) his Sixth Amendment right to effective assistance

of counsel was denied because counsel was not qualified to try a capital case; (2)

counsel was ineffective for failing to conduct an adequate investigation to uncover

evidence that Petitioner had been sexually molested as a young child and to offer

such evidence in mitigation; and (3) the evidence that Petitioner committed rape was

insufficient for conviction on that charge. The superior court denied relief. Petitioner

filed a Petition for Certiorari to the North Carolina Supreme Court, which remanded

the matter back to the superior court for reconsideration. The claim was ultimately

denied by the state post-conviction court on April 28, 1999.

The long and tortured history of this case in federal court began when

Petitioner filed a Petition for Writ of Habeas Corpus on October 7, 1999, raising

fourteen grounds for relief. Following the Recommendation of the United States

Magistrate Judge (docket no. 20), the District Court denied the Petition. (docket no.

26). Petitioner appealed to the Fourth Circuit Court of Appeals, which affirmed the

judgment of the District Court. *Kandies v. Polk*, 385 F.3d 457 (4th Cir. 2004). The

United States Supreme Court vacated the judgment and remanded the case to the

Fourth Circuit for further consideration in light of *Miller-El v. Dretke*, 545 U.S. 231

(2005). *Kandies v. Polk*, 545 U.S. 1137 (2005). The Court of Appeals, in turn,

remanded the case to this court for further consideration in light of *Miller-El*. (docket

no. 42).  On remand, Petitioner filed a motion for discovery. (docket no. 50).  By order filed October 2, 2006, the motion was granted in part and denied in part. (docket no. 63).  Specifically, the court allowed discovery of the criminal record checks run on jury venire members and on the issue of "Yates' exercise of peremptory challenges in his cases with Mr. Bell."  *Id.*  Various other motions were filed following the entry of this order, including motions for reconsideration and motions to supplement the record.  (*See*, *e.g.*, docket nos. 71; 73; 83;84).  By minute order following a hearing on December 20, 2007, Judge Eliason granted Petitioner's second motion for discovery, allowing Petitioner to take four additional depositions and indicating that an evidentiary hearing would be held after the depositions were taken.  Judge Eliason later denied Respondent's request for reconsideration, and allowed discovery to continue.  (docket no. 88).  On September 15, 2008, Respondent filed a motion asking the court to reconsider its earlier decision to hold an evidentiary proceeding.  (docket no. 94).  By order dated January 29, 2009, Judge Eliason denied the motion for reconsideration.  (docket no.105).

**Claims for Relief**

Petitioner was granted the right to pursue limited discovery to establish his claims that the State, at trial, engaged in purposeful discrimination by excusing African-American venire members based on their race.  In granting discovery in this case, the court identified three specific areas of concern with respect to the *Batson* issue.  (docket nos. 88; 94).  The first area dealt with historical evidence alluded to

during the jury selection process. Petitioner's trial attorney, Clark Bell, referring to Yates, stated "[I]t has not been my experience that he has left a single minority member on the jury that he has picked." (Jury Select. Tr. Vol. I at 123). The second area of allowable discovery concerned the criminal records used by the prosecutor as a basis for challenging jurors Randleman, Campbell, Hines, and Wilson. The trial court denied Petitioner's attorney's request to allow him to view these records in order to verify the prosecutor's reasons for the challenges. The final area of supplemental discovery involved the peremptory strikes of jurors Rawlinson and McClure. In support of these strikes at trial, the prosecutor proffered that neither Rawlinson nor McClure had expressed a strong opinion for or against the death penalty, that McClure was nodding off, and that members of the High Point Police Department had told Yates that these two jurors "would not be good jurors for this type of case." *Id.* at 160. Each of these concerns will be addressed separately below.

**Standard of Review**

Review of a state court decision on the merits of a prisoner's habeas claims is limited by the deferential standard of review set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Section 2254(d) provides:

> An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under Section 2254(d)(1), a federal habeas court may grant the writ if the state court arrives at a conclusion "opposite to" or "diametrically different from" that reached by the Supreme Court on a question of law, or if the state court "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A federal habeas court may also grant the writ if the state court "identifies the correct governing legal rule" from Supreme Court precedent "but unreasonably applies it to the facts of the case," or unreasonably extends, or declines to extend, a legal principle from Supreme Court precedent to a new context. *Id.* at 407. The state court need not cite, nor even be aware of, the pertinent United States Supreme Court cases, so long as the result of the state court adjudication is not contrary to, nor involves an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding these pitfalls does not require citation of our cases--indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.") (emphasis in original).

To grant a writ, however, it is not enough that the state decision was an "incorrect" or "erroneous" application of federal law in the eyes of the habeas court. *Id.* at 411. Rather, the state decision must involve an "objectively unreasonable" application of clearly established federal law. *Id.* at 409. "Clearly established federal law" refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). A legal principle is "clearly established" only when it is embodied in a holding of the Supreme Court. *Thaler v. Haynes*, 130 S. Ct. 1171, 1173 (2010) (per curiam); *see also Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010).

Under 28 U.S.C. § 2254, "a determination of a factual issue made by a State court shall be presumed to be correct," and a petitioner has "the burden of rebutting the presumption of *correctness by clear and convincing evidence.*" 28 U.S.C. § 2254(e)(1) (emphasis added). At the same time, a federal court is authorized to grant a writ of habeas corpus where the state court adjudication of the claim "resulted in a decision that was based on an *unreasonable* determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2) (emphasis added).

Section 2254 precludes *de novo* federal habeas review of state court decisions on the merits of a prisoner's claims. *Bell v. Jarvis*, 236 F.3d 149, 160 (4th Cir. 2000) (overruling *Cardwell v. Greene*, 152 F.3d 331, 339 (4th Cir. 1998)). Even a summary adjudication, where the state court "fails to articulate any rationale for its"

decision, is considered an adjudication on the merits and should be accorded deference under Section 2254(d)(1).  *Bell*, 236 F.3d at 163.  When faced with a state court decision which does not explicitly cite or apply federal law, the habeas court should conduct an "independent examination of the record and the clearly established Supreme Court law."  *Id.* at 158.  Nevertheless, the habeas court must still confine its review to whether the "result" of the state court decision "is legally or factually unreasonable."  *Id.* at 163 (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)).

Moreover, when considering whether prosecutors have engaged in purposeful discrimination during jury selection, the Supreme Court has noted that "[d]eference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding 'largely will turn on evaluation of credibility.'"  *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (quoting *Batson v. Kentucky*, 476 U.S. 79, 98 n.21 (1986)).

## *Batson* and *Miller-El*

Under long-standing Supreme Court precedent, the government may not use a peremptory strike against a potential juror solely on the basis of the prospective juror's race.  *Batson*, 476 U.S. at 89.  In order to demonstrate a *Batson* violation, a "defendant must first make a prima facie showing of purposeful discrimination.  Once the defendant establishes a prima facie case of discrimination, the burden shifts to the prosecutor to articulate a race-neutral explanation for the challenge."  *United*

*States v. Grimmond*, 137 F.3d 823, 833-34 (4th Cir. 1998) (citations omitted). "If the prosecutor satisfies this requirement, the burden shifts back to the defendant to prove that the explanation given is a pretext for discrimination." *Id.* at 834 (citation omitted). The defendant must show "*both* that [the Government's stated reasons for a strike] were merely pretextual *and* that race was the real reason for the strike." *United States v. McMillon*, 14 F.3d 948, 953 (4th Cir. 1994) (emphasis in original). "This final step involves evaluating the 'persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)). As noted by the Supreme Court, in undertaking a *Batson* analysis:

> the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge . . . . [E]valuation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Hernandez v. New York*, 500 U.S. 352, 365 (1991) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)). Further, the Supreme Court recently clarified that a trial judge need not have personally observed or recalled the specific aspect of a juror's demeanor on which a prosecutor's explanation is based in order to assess whether a prosecutor's challenge was racially motivated. *Thaler*, 130 S. Ct. at 1175.

Both this court and the Court of Appeals found Petitioner was not entitled to relief under *Batson*. On remand, therefore, as directed by the Supreme Court and the Fourth Circuit, this court must determine whether the Supreme Court's decision in *Miller-El* changes the *Batson* standard in a way that will require a different result in this case.

The analysis undertaken by a district court to determine whether the prosecution has engaged in purposeful discrimination through the use of peremptory strikes remains unchanged. *Golphin v. Branker*, 519 F.3d 168, 186 (4th Cir. 2008) ("*Miller-El* did not alter *Batson* claims in any way."); *Murphy v. Dretke*, 416 F.3d 427, 439 (5th Cir. 2005) (explaining that "[t]he Court did not announce any new elements or criteria for determining a *Batson* claim, but rather made a final factual and evidentiary determination of that particular petitioner's *Batson* claim"). Thus, as noted, a defendant must first make a prima facie case of discriminatory jury selection by the prosecutor. *Miller-El*, 545 U.S. at 239. Once the defendant makes this showing, the prosecutor must then provide a race-neutral explanation for challenging jurors within an "arguably targeted class" and the trial court must determine whether the defendant has established that the prosecutor engaged in purposeful discrimination. *Id.* Thus, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

As pointed out by the Supreme Court in *Miller-El*, one weakness of this analysis is the possibility that if any facially neutral reason is sufficient to answer a *Batson* challenge, trial courts might accept reasons that were false. *Id.* at 240. Although some false reasons might be uncovered "within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand." *Id.* Thus, *Batson* instructs that "a defendant may rely on all relevant circumstances to raise an inference of purposeful discrimination." *Id.* at 240. With this directive in mind, Petitioner was allowed to pursue discovery in three areas to expand the record in an attempt to establish that the prosecutors in his criminal trial had engaged in purposeful discrimination.

## 1. Historical Evidence

The first potential area of discovery involved historical evidence of District Attorney Yates' jury selection practices. *Miller-El* makes clear that historical evidence of discrimination can be a proper subject of consideration in a *Batson* claim. 345 U.S. at 263. In *Miller-El*, this evidence included testimony that the District Attorney's office had adopted a formal policy to exclude minorities from jury service. *Id.* at 264.

During jury selection, Petitioner's attorney, Clark Bell, stated that in his ten years of practice, "it has not been my experience that [Yates] has left a single minority member on the jury that he has picked." (Jury Select. Tr. Vol. I at 123.) This assertion was not addressed further by either side, or by the court; thus, there

14

was no evidence in the record to either support or dispute Bell's conclusory statement. Had there been historical evidence of discriminatory jury selection practices and policies in Yates' judicial district, nothing prevented Petitioner from submitting such evidence to the trial court prior to trial and seeking discovery at that point, or even from presenting any evidence he had on this issue at the *Batson* hearing during trial. Petitioner has never asserted that he was denied the opportunity to present such historical evidence in the trial court. As such, it rightfully could be argued that Petitioner waived any right to present evidence which was available to him at the time of the trial. *See Keeney v. Tamayo-Reyes*, 504 U.S. 1, 9 (1992) ("[I]t is hardly a good use of scarce judicial resources to duplicate factfinding in federal court merely because a petitioner has negligently failed to take advantage of opportunities in state-court proceedings.").

Nevertheless, in this habeas proceeding, Petitioner was granted the right to "examine the prior record of state cases involving both Mr. Yates and Mr. Bell to determine the patterns, if any, of Mr. Yates in peremptorily excluding black jurors." (docket no. 63, Order at 10). While neither party chose to take Bell's deposition on remand, Petitioner submitted affidavits from several Randolph County attorneys, including Bell, who all stated their opinion that District Attorney Yates had a "marked tendency to remove qualified African-Americans from the juries when he tried cases." (*See*, *e.g.*, Pet. Brief on Remand, Ex. 11, Affidavit of C. Pierre Oldham). The court notes, however, that the three prosecutors, Yates, Gregson and Toomes,

asserted in their affidavits and depositions that Yates' primary goal during jury selection was to seat unbiased jurors who were not opposed to the death penalty. Gregson and Toomes both stated under oath that they never saw evidence of an intent on Yates' part to exclude potential jurors based on their race. In fact, former Assistant District Attorney Toomes categorically stated that she has "never known [Yates] to express or otherwise manifest a desire to challenge a juror based on the juror's race." (docket No. 83, Attachment 2, Affidavit of Elizabeth M. Toomes ¶ 5). I note as well that a Census 2000 summary report, which was submitted by Respondent as an attachment to its Brief in support of its Motion to Expand the Record (docket no. 96), shows that the African-American population of Randolph County, Yates' home county, represented only 5.6% of the total population at the time of trial, and therefore the small number of minorities on juries would be expected.

Petitioner argues here, as he did in state court, that the statistical disparity between the State's peremptory challenges of African-American jurors and similar challenges of non-minority venire members is evidence of discriminatory intent. Statistical evidence is properly a matter of consideration for a court undertaking a *Batson* analysis. *See Miller-El*, 537 U.S. at 331; *Golphin* ,519 F.3d at187. Such evidence is appropriately viewed in context; however, and the limitation of the statistical evidence presented by Petitioner is that the very small number of African-

Americans in the jury pool substantially dilutes any inference that can be drawn from the statistics.

As noted, to grant relief based on a state court's determination at the third step of the *Batson* analysis, "a federal habeas court must find the state-court conclusion to be 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting 28 U.S.C. § 2254(d)(2)). In addition, under 28 U.S.C. § 2254(e)(1), the determination is "presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* at 338-39. Petitioner has not met either standard.

## 2.  Criminal Records Used during Jury Selection

Petitioner argued on appeal that the strikes of jurors Randleman, Campbell, Hines and Wilson were racially motivated. At trial, the State explained these strikes by noting that these jurors had criminal records which they did not disclose on juror questionnaires or during voir dire. Petitioner's attorney asked that the state be required to disclose the criminal records possessed by the prosecutor and used as a basis for challenging these four jurors. The request was denied by the trial court. In this habeas proceeding, Petitioner was granted the right to examine these criminal records. Petitioner sought to show that the prosecutors had discriminated against black jurors by only collecting or using the criminal convictions of black jurors, as opposed to those of white jurors.

Because the records used by the prosecutors no longer exist, however, any discriminatory use of them cannot be established. In a deposition taken in May 2008, Yates explained that the trial took place in another county, where he did not have an office, and that he was working out of his car during the trial. He also stated that his office had moved at least twice since Petitioner's trial, and that, at the time of the trial, he was not required to maintain all of the documents and notes in the case.

Petitioner argues that the missing evidence indicates discriminatory use by the prosecution. Absent some other showing that the documents were purposely destroyed, however, there is no reason to conclude that the records would have shown discriminatory intent by the prosecution. This proffer falls far short of clear and convincing evidence necessary to show that the trial court erred in denying the *Batson* challenges. *Cf. Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").[1]

Furthermore, it is doubtful that discovery should have been allowed on this issue in the first place. As to determinations of state law, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law

---

[1] Moreover, it must be remembered that a prospective juror's criminal record, disclosed or not, is race-neutral on its face. *Matthews v. Evatt*, 105 F.3d 907, 917-18 (4th Cir. 1997). Petitioner simply did not rebut this presumption. The trial court did not err in finding that the State provided race-neutral reasons for striking these jurors that were not pretexts for racial discrimination.

questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  The trial court's refusal to force Yates to turn over jury selection documents was based entirely on state law. Sections 15A-903 and 904 of the North Carolina General Statutes describe the types of information held by the State that may or may not be disclosed to the defendant. The North Carolina Supreme Court found that the trial court correctly followed state law in denying Petitioner's request to view the criminal records held by the State. *State v. Kandies*, 342 N.C. at 437-38, 467 S.E.2d at 77.  This holding was neither contrary to nor involved an unreasonable application of clearly established federal law, as determined by the Supreme Court.

### 3.  Jurors Rawlinson and McClure

The final area of concern regards the State's use of peremptory challenges to dismiss jurors Rawlinson and McClure.  Reviewing courts have focused on these challenges primarily because of the reasons for the dismissals given by the prosecutor.  A careful reading of the transcript shows, however, that these concerns may have been unfounded.  When asked his reasons for excusing these two jurors, Yates responded:

> Mr. Yates:  Your Honor, I would just point out that Ms. Rawlinson had not even thought about the death penalty, certainly was not a strong opinion for or against the death penalty.  And Mr. McClure was in a similar situation except that he also -- my officer noticed that he nodded off at least twice.  Not that I'm saying this was the most interesting part of the trial, but I certainly do not believe he was paying sufficient attention in this case, though.  Also, I discussed the jury panel with the High Point Police Department, and they

> indicated Mr. McClure and Ms. Rawlinson would not be good jurors for this type of case.
>
> The Court: Do you want to elaborate on that, please?
>
> Mr. Yates: Your Honor, I asked most everybody and basically indicated anyone that they had any contact with prior to the trial. Primarily, the *reason* was that they were weak on *the death penalty question*.

(Jury Select. Tr. Vol. I at 160-61) (emphasis added). The word "reason" in the last sentence could be referring to either the prosecutor's reason for seeking dismissal of these jurors or the reason that the High Point Police Department thought that they would not be good jurors for this type of case. Every reviewing court up to this point has adopted the latter explanation. *See State v. Kandies*, 342 N.C. at 436, 467 S.E.2d at 76; *Kandies v. Polk*, 385 F.3d at 475. The former explanation is much more likely what was intended by the statement and what was understood by the court. When asked to elaborate on his statement regarding the High Point Police Department, Yates explained that he had received information regarding which potential jurors had had contact with the High Point Police Department. He then restated his primary reason for challenging these two jurors was that they were weak on the death penalty questions that he had asked them, only minutes before.

At this point in the jury selection process, the trial judge had heard the prosecutor ask over a dozen prospective jurors substantially the same question regarding the death penalty:

> I think you've heard several times before there may be a possible second phase in the trial if the Defendant is convicted of first degree murder. Only if he's convicted of that. In the second phase the question would be whether or not the Defendant receives the death penalty or life imprisonment. Do you have any strong feelings for or against the death penalty?

(Jury Select. Tr. Vol. I at 115-16). In explaining his previous exercise of a peremptory challenge of Juror Randleman, Yates noted that her criminal record showed previous convictions for "worthless checks and two speeding violations" and "[s]he was hesitant on the death penalty questions." *Id.* at 124. He also asked for Juror Jinwright to be excused "because she has worked with three- or four-year-old children and was hesitant on the death penalty question." *Id.* It seems logical to conclude that the "death penalty question" that Yates was referring to in regard to jurors Rawlinson and McClure was the question that he asked each of them in the courtroom. The fact that neither the trial court nor Petitioner's attorney questioned Yates' explanation of his contact with the High Point Police Department strongly suggests that they had the same interpretation of Yates' statement.[2]

Following the remand from the Fourth Circuit, Petitioner took the depositions of prosecutors Garland Yates and Andrew Gregson and Detective Mark McNeill.[3]

---

[2] It is notable that, even with its interpretation which was less favorable to the prosecution, the Fourth Circuit Court of Appeals still found that Petitioner had failed to show that Yates' reasons for removing Rawlinson and McClure were a pretext for purposeful racial discrimination. *Kandies v. Polk*, 385 F.3d at 476.

[3] McNeill retired from the High Point Police Department on October 1, 2007.

Prior to the start of Petitioner's trial, Gregson was employed as an attorney for the High Point Police Department, but he had already been hired as an Assistant District Attorney in Yates' office. (Deposition of Andrew Gregson at 7-8). In his deposition, Yates testified that it would have been his normal practice to ask Gregson to circulate a jury list among the police department to see if any officers had information that might be helpful to the prosecution in jury selection.[4] (Deposition of Garland Yates at 15-16).

The record supports the prosecutor's characterizations of both Rawlinson and McClure's views on the death penalty. During voir dire, the following exchange took place:

| | |
|---|---|
| Mr. Yates: | Do you have any strong feelings or beliefs concerning the death penalty? |
| Juror Ms. Rawlinson: | No. |
| Mr. Yates: | Have you ever thought about it at any time in the past? |
| Juror Ms. Rawlinson: | No, I haven't. |

(Jury Select. Tr. Vol. I at 137). Although she went on to explain that she would be able to consider the death penalty as a possible punishment, her statement that she

---

[4] Yates, who at the time of his deposition was recovering from a serious automobile accident resulting in some memory loss, testified that he had no independent recollection of directing Gregson to show the jury list to High Point police officers. He did testify, however, that it would have been standard practice for him to do so, especially since the trial was being conducted in an adjacent county where he knew few people. Gregson, in his deposition, confirmed that Yates asked him to circulate the jury list among the High Point Police Department.

had never thought about the death penalty at any time in the past obviously was of concern to Yates. He explained to Ms. Rawlinson that "[a]t this point, unfortunately, I have got to make you think about it a little bit. I don't want you to two days later decide no, you can't do that." *Id.* at 138. This apparent concern would have been enough for many prosecutors to ask for a juror to be removed and it was not unreasonable for the trial court to accept this explanation. *See United States v. Barnette*, No. 3:97CR-23, 2010 WL 2085312, at *12 (W.D.N.C. May 20, 2010) ("Prosecutors may strike prospective jurors for any constitutionally valid reason, and it has long been settled in the Fourth Circuit that the government may use a peremptory challenge to strike a venireman who has reservations about capital punishment even if those reservations do not rise to the level of a challenge for cause.").

Later, Yates questioned Juror McClure regarding his views on the death penalty:

| | |
|---|---|
| Mr. Yates: | Now, do you have any strong feelings concerning the death penalty? |
| Juror Mr. McClure: | No. Do I have any feelings against it? |
| Mr. Yates: | Do you have any feelings period about the death penalty? |
| Juror Mr. McClure: | Well - - |
| Mr. Yates: | Have you ever thought about it? |
| Juror Mr. McClure: | Yes. |

| Mr. Yates: | What - - The State and the Defendant want someone who can consider both possible punishments, would not automatically vote one way or the other. |
| Juror Mr. McClure: | Well, some cases deserve it and some don't. |

(Jury Select. Tr. Vol. I at 152-53). Although Mr. McClure did state that he could consider both punishments, the prosecutor's uncertainty about Mr. McClure's views on the death penalty is understandable. Juror McClure's initial answer suggested that he did not have strong feelings about the death penalty, but he later indicated his opinion that "some cases deserve it and some don't." Moreover, in giving his reasons for challenging Mr. McClure, Yates also noted ". . .my officer noticed that he nodded off at least twice. Not that I'm saying this was the most interesting part of the trial, but I certainly do not believe he was paying sufficient attention in this case, though." *Id.* at 160. Neither defense counsel nor the court questioned this assertion.

Petitioner points out that Yates has admitted during his deposition that he never talked directly to any members of the High Point Police Department regarding the potential jurors in Petitioner's trial, apparently contradicting Yates's statement during jury selection that "I discussed the jury panel with the High Point Police Department. . . ." He did explain during his deposition that he asked Gregson to obtain information on the jurors from the members of the police department where Gregson worked. Yates may have been taking credit for gathering all of the information or implying direct contact with the police department to bolster his

explanation. Nevertheless, there is no indication that the main substance of his statement was false, namely that the officers provided information to Yates that jurors Rawlinson and McClure would not be favorable jurors for this case.

After hearing the *Batson* challenge regarding jurors Rawlinson and McClure, the trial court found as a fact that the reasons enunciated by Yates for the removal of the two jurors were valid bases to justify their removal. The court also made a finding of fact that Petitioner had "failed to raise an inference that the Prosecutor at this stage of the proceeding has used his peremptory challenge as to exclude veniremen solely on the basis of their race." *Id.* at 163. This court is required to grant a presumption of correctness to the state court's finding that there was no evidence of discrimination. Even including the newly allowed discovery information, there is a lack of clear and convincing evidence needed to rebut that presumption.

Finally, the North Carolina Supreme Court noted, upon direct review of Petitioner's conviction and death sentence,

> Factors to which this Court has looked to determine the presence or absence of intentional discrimination include (1) the susceptibility of the particular case to racial discrimination, (2) whether the State used all of its peremptory challenges, (3) the race of witnesses in the case, (4) questions and statements by the prosecutor during jury selection which tend to support or refute an inference of discrimination, (5) whether the State accepted any black jurors, and (6) whether similarly situated whites were accepted as jurors.
>
> In this case the defendant is white, the victim was white, and several witnesses are white. The prosecutor accepted three black jurors when he had peremptory challenges remaining.

*State v. Kandies*, 342 N.C. at 435, 467 S.E.2d at 75. Petitioner has simply not met

his burden of showing that the state court's holding was "an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). [5]

**Conclusion**

Even with the benefit of additional discovery that reached beyond the four corners of the case, Petitioner has not produced clear and convincing evidence that the trial court erred in finding a lack of purposeful discrimination. Accordingly, **IT IS RECOMMENDED** that the Petition be **DENIED**.

WALLACE W. DIXON
United States Magistrate Judge

April 5, 2011

---

[5] Petitioner submitted an affidavit containing statistical evidence regarding the patterns of jury strikes in Randolph County. This affidavit was prepared as part of Petitioner's state claim under the North Carolina Racial Justice Act (RJA). *See* N.C. Gen. Stat. §§ 15A-2010 - 2012 (2009). Respondent argues that this court is not the proper forum for a claim under the RJA. While Respondent is technically correct, I note that Petitioner is not asserting a RJA claim here; rather, he seeks to use the statistical data gathered in preparation for that claim to show here the alleged statistical disparity in the selection of juries in Randolph County. I find that this statistical evidence is but one part of the *Batson/Miller-El* analysis; and, indeed, in this case that evidence does not "carry the day." *Golphin*, 519 F.3d at 187.